[Cite as *State v. Buck*, 2017-Ohio-8242.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-160320 |
| | | TRIAL NO. B-1400664-A |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| ANDRE BUCK, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Sentence Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  October 20, 2017

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson* and *Demetra Stamatakos*, Assistant Public Defenders, for Defendant-Appellant.

**MYERS, Judge.**

{¶1} Defendant-appellant Andre Buck appeals the judgment of the Hamilton County Common Pleas Court convicting him, after a jury trial, of the kidnapping of Tyrell George.

{¶2} Buck was indicted for kidnapping, with firearm specifications, and for having a weapon while under a disability. Three codefendants, Anthony Barrow, Timothy Watson, and Lonnie Rucker, were also indicted for the kidnapping.

{¶3} Buck filed a motion to suppress, which the trial court denied. Buck and Barrow were tried together. The jury found Buck guilty of kidnapping, but acquitted him of the gun specifications and the weapon-under-disability charge. The trial court sentenced Buck to 11 years in prison.

{¶4} Buck now appeals. In six assignments of error, he challenges: (1) the denial of his motion to suppress; (2) the denial of his rights to due process by the prosecutor; (3) the denial of his rights to due process by the trial court; (4) the admission of certain photographs; (5) his sentence; and (6) the weight and sufficiency of the evidence. We conclude that the court committed reversible error when it failed to properly award jail-time credit, but we affirm the trial court's judgment in all other respects.

### *Buck's Motion to Suppress*

{¶5} In his first assignment of error, Buck argues that the trial court erred by denying his motion to suppress. He contends that the court failed to apply the appropriate legal standard when it determined that exigent circumstances existed to justify the warrantless search of his person and his apartment, and the search of the contents of his cell phone. He asserts that the exigent-circumstances exception to

the requirement for a warrant requires both probable cause and exigent circumstances.

{¶6} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 787 N.E.2d 71, ¶ 8. We must accept the trial court's factual findings if they are supported by competent and credible evidence, but we review the court's legal conclusions de novo. *Id.*

{¶7} *The Suppression Hearing.* At the hearing on Buck's motion to suppress, Cincinnati Police Detective Bill Hilbert testified that Tyrell George was kidnapped on February 6, 2014, between 7:00 and 8:00 p.m. The kidnappers called George's brother Timothy Kellam and demanded $100,000 for his return. They warned Kellam that if he failed to pay the ransom money, George would be killed. In one of the ransom calls, George told Kellam that the kidnappers had shot him.

{¶8} By 10:00 p.m., Kellam worked with Detective Hilbert and other investigators who monitored every ransom call made by the kidnappers to Kellam. During the night of the 6th and the morning of the 7th, Kellam received numerous ransom calls from two different men who continually made threats to hurt or kill George. Throughout the night, the police covertly worked with Kellam so that it would appear to the kidnappers that Kellam was complying with their demands. After several hours, however, the police became concerned that the kidnappers suspected police involvement and that they would act on their threats to kill George.

{¶9} At one point, the kidnappers demanded that Kellam meet them at a Shell gas station at Colerain Avenue and Hopple Street. Two undercover officers, one of whom dressed like Kellam, drove Kellam's car to the Shell station and parked at the agreed meeting place. For the next two and a half to three hours, the kidnappers demanded in multiple phone calls to Kellam that he move his vehicle to

different locations, but Kellam, at the instruction of the police, told the kidnappers he would not do so.

{¶10} Then Detective Hilbert instructed the undercover officers in Kellam's car to drive it around the block. As they did so, the kidnappers, who were speaking to Kellam on the phone, identified a nearby street by name and told Kellam to change lanes immediately. With that, Detective Hilbert knew that the kidnappers were conducting counter-surveillance to the police surveillance on both the Shell station and on Kellam's car. The fact that the kidnappers had the foresight to operate in that manner heightened police concern for George's safety.

{¶11} According to Detective Hilbert, the police still had no idea where George was. Hoping that George was somewhere near the Shell station, police were looking for suspicious things in that area. Hilbert said, "[O]ur number one goal right then [was] to find Mr. George and find him alive."

{¶12} The police identified two telephone numbers from which ransom calls had been made to Kellam's phone, one of which was (513) 498-2051, and made an "emergency exigent request" to Cincinnati Bell for records pertaining to that number. In addition, Cincinnati Police Officer Timothy Bley of the fugitive-apprehension unit testified that his unit had "access to a lot of computer programs and databases that the average police officer wouldn't have access to and we use those sometimes to track people [and] try to locate them." He testified that on the morning of February 7, 2014, using information from various databases, police were able to track phone calls to (513) 498-2051, and "by tracking those people backwards," were able to identify Buck as the user of the cell phone. This involved linking people and their connections to each other by the use of various databases. In analyzing this information, the police were able to connect Buck as the user of the phone.

{¶13} Police identified Buck's address as 2872 Montana Avenue, Apartment 4, and learned that the (513) 498-2051 phone was "pinging" from a nearby cell tower

4

that morning. Police knew that recovery of that phone was vital to locating George, and that the delay necessitated by the process of obtaining a search warrant could have impaired police attempts to locate George and could have placed George in greater danger.

{¶14} Officer Bley and other officers went to Buck's apartment and knocked on the door. Buck answered the door. He was alone in the apartment. Officers entered the apartment to look for George to make sure that he "wasn't lying inside tied up or anything like that." George was not inside.

{¶15} Police recovered a cell phone from Buck, and dialed (513) 498-2051 to ensure that it was the phone that they were looking for. Buck's cell phone rang.

{¶16} Meanwhile, during the time that police officers were at Buck's apartment, Kellam was at the police station on the phone with another one of the kidnappers.

{¶17} Police officers took Buck and his phone to Detective Hilbert at the homicide unit. The police asked Buck for his assistance in locating George, but Buck would not cooperate. In speaking with Buck, Detective Hilbert recognized Buck's voice from the numerous ransom calls he had monitored.

{¶18} At that point, police still did not know where George was, but they were aware that a second kidnapper was still contacting Kellam for ransom money. Detective Hilbert believed that the danger to George had increased: "[W]e were pretty desperate at that point." So the police made another emergency request to Cincinnati Bell to download electronic data from Buck's cell phone. According to Detective Hilbert, the police were concerned that obtaining a search warrant would cost valuable time and might increase the danger to George. The detective testified that "every second counted."

{¶19} *Warrantless Search of Buck and His Home.* Buck first argues that exigent circumstances did not justify the warrantless search of Buck and his

apartment. "[W]arrants are generally required to search a person's home or his person unless the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), quoting *Mincey v. Arizona*, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Where exigent circumstances exist, a warrantless search is reasonable because "there is a compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).

{¶20} Exigent circumstances allow a warrantless entry into a residence if probable cause to arrest or to search exists. *See State v. Robinson*, 103 Ohio App.3d 490, 496, 659 N.E.2d 1292 (1st Dist.1995), citing *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *State v. Upton*, 1st Dist. Hamilton No. C-050076, 2006-Ohio-1107, ¶ 17; *State v. Martin*, 1st Dist. Hamilton No. C-040150, 2004-Ohio-6433, ¶ 22; *State v. Sheppard*, 144 Ohio App.3d 135, 141, 759 N.E.2d 823 (1st Dist.2001). Police may make a warrantless entry into a residence to prevent the imminent destruction of evidence, *State v. Grant*, 67 Ohio St.3d 465, 470, 620 N.E.2d 50 (1993), or to engage in "hot pursuit" of a fleeing suspect, *Middletown v. Flinchum,* 95 Ohio St.3d 43, 765 N.E.2d 330 (2002), syllabus; *State v. Mitchem*, 1st Dist. Hamilton No. C-130351, 2014-Ohio-2366, ¶ 24.

{¶21} The United States Supreme Court and the Supreme Court of Ohio have recognized a narrower subset of exigent circumstances where law enforcement officers need to respond to emergency situations to protect people from death or serious injury. *Brigham City* at 403; *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 21. The "emergency-aid" exception allows police to enter a home without a warrant *and without probable cause* when they reasonably believe, based on specific and articulable facts, that a person within the home is in need of

6

immediate aid. *See Mincey* at 392; *State v. Applegate*, 68 Ohio St.3d 348, 349-350, 628 N.E.2d 942 (1994); *State v. Sladeck*, 132 Ohio App.3d 86, 88, 724 N.E.2d 488 (1st Dist.1998); *State v. Secriskey*, 9th Dist. Summit Nos. 28093 and 28094, 2017-Ohio-4169, ¶ 9; *State v. Fisher*, 5th Dist. Fairfield No. 13 CA 35, 2014-Ohio-3029, ¶ 39, citing *State v. Gooden*, 9th Dist. Summit No. 23764, 2008-Ohio-178, ¶ 6. Nevertheless, a warrantless entry justified by the emergency-aid exception must be strictly circumscribed by the exigency that initially justified it, and "once the emergency has been alleviated, further intrusion must be sanctioned by a warrant." *State v. Newell*, 2d Dist. Montgomery No. 21567, 2006-Ohio-5980, ¶ 13.

{¶22} To determine whether police faced an emergency that justified acting without a warrant, courts look to the totality of the circumstances. *Missouri v. McNeeley*, 569 U.S. 141, 149, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), citing *Brigham City* at 406. To that end, one important consideration in determining whether an exigency existed is the nature of the underlying crime. *See Welsh v. Wisconsin*, 466 U.S. 740, 754, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

{¶23} Police officers do not need "ironclad proof" of a life-threatening injury to invoke the emergency-aid exception. *Dunn* at ¶ 19, quoting *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009). The question as to whether exigent circumstances exist is viewed through the eyes of a reasonable police officer. *Id.,* citing *Brigham City*, 547 U.S. at 404, 126 S.Ct. 1943, 164 L.Ed.2d 650.

{¶24} Here, the police had an objectively reasonable basis for believing that the still-missing victim had been shot and would be killed based on the facts available to them and the escalating kidnappers' ransom demands. The police reasonably believed that both the injured victim whose life was in jeopardy and the (513) 498-2051 cell phone used by a kidnapper to make ransom calls to the victim's brother were in the apartment. Even though the victim was not found in the apartment, the police reasonably believed that the cell phone was essentially a

7

lifeline to bring him home safely.  Under the totality of the circumstances, therefore, the warrantless search of Buck's home and person was justified by the emergency-aid exception.   And contrary to Buck's assertion, the state was not required to also demonstrate probable cause that he was involved in the crime before the police entered his home.  *See Gooden*, 9th Dist. Summit No. 23764, 2008-Ohio-178, at ¶ 6 (the emergency-aid exception allows officers to enter a home without a warrant and without probable cause)*.*

{¶25}  *Warrantless Search of Buck's Cell-Phone Data.*  In the context of cell phones, police officers must generally obtain a warrant to search data contained in a cell phone, even if the phone was seized incident to an arrest.  *See Riley v. California,* ____ U.S. ____, 134 S.Ct. 2473, 2493, 189 L.Ed.2d 430 (2014); *see also State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, syllabus.  But the United States Supreme Court recognized in *Riley* that the exigent-circumstances exception may justify the warrantless search of a cell phone's data:

> Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury. * * * In light of the availability of the exigent circumstances exception, there is no reason to believe that law enforcement officers will not be able to address some of the more extreme hypotheticals that have been suggested:  a suspect texting an accomplice who, it is feared, is preparing to detonate a bomb, or a child abductor who may have information about the child's location on his cell phone.

*Riley* at 2494; *Smith* at ¶ 29.  *See United States v. Fifer*, 863 F.3d 759, 766 (7th Cir.2017); *United States v. Gilliam*, 842 F.3d 801, 805 (2d Cir.2016).

{¶26} In this case, the warrantless search of Buck's cell phone was justified by exigent circumstances where the still-missing kidnapping victim's life was in danger, and the police reasonably believed that the phone had been used in the kidnapping operation. The exigency did not evaporate upon the recovery of Buck's cell phone and his arrest. On the contrary, those circumstances led the police to believe that the peril to the kidnapping victim had increased because a second kidnapper was still trying to negotiate a ransom from Kellam and would surely discover that his accomplice was in police custody. The police had probable cause to search the cell phone under these exigent circumstances and the exigent circumstances had not abated (which would have required a warrant).

{¶27} Consequently, we hold that the trial court properly concluded that the warrantless searches of Buck, his home, and his cell phone were justified by exigent circumstances. We overrule the first assignment of error.

### Weight and Sufficiency of the Evidence

{¶28} For ease of discussion, we address the remaining assignments of error out of order. In his sixth assignment of error, Buck argues that his conviction for kidnapping was against the manifest weight of the evidence and based upon insufficient evidence. Buck does not claim that the state failed to prove that the kidnapping of George occurred. Rather, he asserts that the state failed to prove that he was involved in the kidnapping.

{¶29} *Evidence Presented at Trial.* At the jury trial, the state presented the testimony of Tyrell George, his brother Timothy Kellam, codefendant Lonnie Rucker, a telephone-records custodian, forensic specialists, and multiple investigators, including Detective Hilbert and Officer Bley, in addition to numerous exhibits.

{¶30} Telephone records revealed that on the morning of February 6, 2014, Buck and his codefendant Anthony Barrow communicated about 20 times, and in one text, Buck had asked Barrow, "Babysitter still on dek?" The term babysitter referred to a person who watched over a kidnapped victim to make sure he would not escape, while other kidnappers secured ransom money.

{¶31} Later that day, Barrow called George on the pretense of wanting to buy marijuana. George did not know Barrow, but Barrow convinced him that he had bought marijuana from George before. The two exchanged calls and agreed to meet. When George met up with Barrow, he got into Barrow's van, where he was assaulted by Barrow and a second man. The men bound George with duct tape, wiped his clothing and neck with bleach, and then drove away.

{¶32} George was moved into a second van where two more kidnappers, Timothy Watson and Lonnie Rucker, "babysat" him through the night and into the next day.

{¶33} Rucker testified that Watson had contacted him on February 6th about being a babysitter. That night, Rucker picked up Watson and drove to a spot where a person was tied up in the back of a van. Watson said they had to sit and watch the victim until the other kidnappers came back with the money.

{¶34} Communications continued between Kellam and the kidnappers. The officers became more and more concerned about George's safety.

{¶35} As discussed in more detail under the first assignment of error, the police were ultimately able to locate Buck and a phone that had been used to make ransom calls. At trial, Officer Bley clarified that Buck's phone was recovered from Buck's pocket.

{¶36} Buck was arrested at about 9:30 a.m., on the 7th, but the police still had no idea where George was.

10

{¶37} Within hours of Buck's arrest, Watson and Rucker were frustrated that the ransom had not been paid and were concerned that Kellam had gone to the police. So they left the area, leaving George alone in the van.

{¶38} At about 2:00 p.m., George escaped from the van and ran to a nearby home. The occupant called the police who responded, and the police brought George to the homicide unit. The police recovered pieces of duct tape from George's socks, noted bleach stains on his clothing, and photographed abrasions on his wrists, caused by the duct tape.

{¶39} Police recovered the van that George had escaped from. In the van, they found duct tape, pieces of mail addressed to Barrow, and Barrow's and Watson's fingerprints.

{¶40} Telephone records revealed that Kellam had received about 45 ransom calls from two different telephone numbers, (513) 498-2051 and a second number that Barrow admitted was his.

{¶41} A Cincinnati Bell representative, Paula Papke, testified that the "IMEI, which is basically the serial number for the phone, which would be contained within the phone itself" for Buck's cell phone matched the IMEI listed in the subscriber record for (513) 498-2051, a prepaid account. She said that subscribers who use prepaid accounts usually provide fictitious personal information when setting up the account. Prepaid-account subscribers have to provide a date of birth as the password for the account, and, without the password, a subscriber cannot access the account. Papke said that many prepaid-account subscribers provide a date of birth that is a single digit off from their actual birthdate. She said that the number (513) 498-2051 was subscribed in the name "Tone Montrell," and that the account password was "11/2/76." Buck's date of birth is November 2, 1977.

{¶42} Telephone records confirmed that Buck and Barrow communicated with each other and with Kellam and Watson through the evening of the 6th and the

11

morning of the 7th. In addition, the records confirmed that Buck's cell phone "pinged" off cell towers at times and locations that corresponded to those of George's abduction, the kidnappers' movements, and the officer's arrival at his apartment.

{¶43} In recorded telephone calls from the jail, Buck complained to his mother that his live-in girlfriend had been talking to people about the case, specifically about his cell phone, an important part of the case against him, according to Buck. Buck also angrily confronted his girlfriend about her disclosing the fact that he had purchased his cell phone from her son, when she was well aware that "this whole case [is] surrounded by a cell phone."

{¶44} Barrow testified in his defense that George was a friend of his. According to Barrow, George's brothers were known to be "[i]nto the high-end drug trade." George hatched an extortion plan with Barrow, Watson, Profit, Little D, and Little C to get $100,000 from George's brother. George was to receive $40,000.

{¶45} Barrow said that George got into his van voluntarily and that they drove around. At one point, Barrow said, they sat at the Shell station to see if George's brother would come with the money. At that point, they realized that the police might be involved, so Barrow left the group. He did not know where George went.

{¶46} Barrow testified that he knew Buck, but that Buck was not involved in the kidnapping. He said that he had spoken to several people "through that Buck phone," one of them being Buck.

{¶47} Buck did not testify at trial.

{¶48} *Our Standard of Review.* In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When considering

a challenge to the weight of the evidence, the court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶49} To find Buck guilty of kidnapping pursuant to R.C. 2905.01(A)(1), the jury was required to find that he, by force, threat, or deception, removed George from the place where he was found or restrained George's liberty for the purpose of holding him for ransom. On appeal, Buck challenges the evidence identifying him as one of the perpetrators of the kidnapping.

{¶50} ***Buck's Phone.*** Buck contends that the state presented no direct evidence that he was the person using the (513) 498-2051 cell phone to make ransom calls to the victim's brother. The phone was in his pocket and contained selfie photographs and videos of Buck. The required-birthdate password for the prepaid account on the phone was one digit different than Buck's actual birthdate. And in his jail calls, Buck made it clear that he knew that his phone was damning evidence against him. The jury could reasonably conclude that he was the person using the phone for ransom calls.

{¶51} ***Voice Identification.*** Buck also contends that Detective Hilbert's identification of his voice as one of the kidnapper's voices was "fundamentally incredible" because the detective was neither an expert at voice identification nor had familiarity with Buck's voice at the time of the offense. Buck did not object to the identification at trial, but his defense counsel cross-examined the detective about the identification.

{¶52} A witness identifying a person's voice does not have to be an expert in voice recognition. *See State v. Seay*, 1st Dist. Hamilton No. C-090233, 2010-Ohio-896, ¶ 27; *State v. Pettaway*, 3d Dist. Seneca No. 13-14-18, 2015-Ohio-1597, ¶ 37. A

witness may give an opinion identifying a voice "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." *See* Evid.R. 901(B)(5).

{¶53} The evidence demonstrated that Detective Hilbert spoke to Buck the morning of his arrest and immediately recognized Buck's voice as that of one of the kidnappers who had made multiple calls to Kellam. Phone records confirmed that while Detective Hilbert was listening in on the ransom calls, Buck had called Kellam at least seven times. Five of those calls lasted between three and 11.5 minutes. Detective Hilbert's credibility was for the jury to determine. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶54} Following our review of the record, we hold that Buck's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. Buck was found in possession of a cell phone used to make ransom demands, and Detective Hilbert recognized his voice as one of the callers. And Buck's jail calls demonstrated that he was involved in the crime and knew the incriminating nature of the phone. We overrule the sixth assignment of error.

### *Prosecutorial Misconduct*

{¶55} In his second assignment of error, Buck argues that his right to due process was violated by prosecutorial misconduct. He asserts that the prosecutor failed to disclose a second police interview with Tyrell George, and then presented a theory of prosecution based in part on a statement "proven false" by the undisclosed interview. In addition, he argues that the prosecutor allowed a state's witness to "present likely perjured testimony without correction."

{¶56} Generally, prosecutorial misconduct will not provide a basis for overturning a conviction unless, on the record as a whole, the misconduct can be said

to have deprived the defendant of a fair trial. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). The test for whether prosecutorial misconduct mandates reversal is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 45.

{¶57} *Failure to Disclose the Second Interview of Tyrell George.* First, Buck argues that the prosecutor failed to disclose that he and Detective Hilbert had interviewed George ten to 15 days after the detective's February 7th interview of George. Buck contends that in the second interview, George revealed that he had voluntarily gotten in the van driven by Barrow to sell marijuana to Barrow. In the first interview, he told Detective Hilbert that he was grabbed off the street.

{¶58} At trial, George testified that he had foolishly gotten into the van at Barrow's direction, and that Barrow "had somebody in the back waiting on me, snatched me up, choking me out." On cross-examination, George acknowledged that he had told the police that the "van pulled down on me and snatched me up," and that later on in the first interview, he had said, "[T]hey was already parked and dude say hey. I'm walking. I turned around a little bit, next thing you know I'm in the back of the van fighting with this dude[.]" When asked whether the police had interviewed him a second time, George initially denied it and then stated, "Not that I can remember. I don't know. I don't remember. I just remember I came up a couple days after it happened and they talked to me, showed me a couple picture."

{¶59} The issue of a second George interview arose during the cross-examination of Detective Hilbert by Buck's attorney. The attorney asked whether George, when interviewed on the date of his escape, had mentioned that he was selling marijuana when he was kidnapped. The detective responded that George had not. Then the detective said that he was not surprised when, ten to 15 days later,

15

George told him about the arranged and attempted marijuana sale. At that point, codefendant Barrow's counsel asked the court for a sidebar conference.

{¶60} At sidebar, Barrow's attorney indicated that he was not aware that the police had interviewed George a second time. Buck's attorney, on the other hand, at no time asserted that he was unaware of a second interview. Instead, his focus was on exploiting the inconsistencies between George's trial testimony and his first police interview, noting specifically, "my problem is not with [the prosecutor] or Detective Hilbert."

{¶61} The prosecutor explained to the trial court that he believed he had provided information about the second interview to defense counsel, noting that both defendants had been represented by previous counsel. The trial court noted that there had been no suggestion that the prosecutor had withheld any information.

{¶62} As an accommodation to Barrow's counsel, the trial court allowed a brief recess during which the prosecutor and both defense counsel spoke with Detective Hilbert about the second interview. Afterwards, the court noted that the content of the second interview included George's acknowledgement to Detective Hilbert that he had omitted telling the detective that he had arranged to meet Barrow to sell him marijuana.

{¶63} Then the court allowed Barrow's counsel to further cross-examine Detective Hilbert about the second interview and whether he had divulged that interview to defense counsel.

{¶64} It is not clear from the record that the prosecutor failed to disclose the second George interview. Even if we assume the discovery violation occurred, we hold that the trial court did not abuse its discretion in its handling of the matter.

{¶65} Crim.R. 16 controls the discovery process, the purpose of which is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights

of defendants, and to protect the well-being of witnesses, victims, and society at large." *See* Crim.R. 16(A). The rule gives the trial court the discretion to determine an appropriate sanction for a discovery violation. *See* Crim.R. 16(L); *State v. Wiles*, 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1991). In making such a determination, the court must consider whether (1) the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the defendant in the preparation of a defense, and (3) whether the defendant was prejudiced. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus. The court "must impose the least severe sanction that is consistent with the purpose of the discovery rules." *Id.* at syllabus, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of the syllabus.

{¶66} In this case, the record demonstrates that, even if the prosecutor failed to disclose George's second interview to Buck's counsel, the discovery violation was not willful. Buck does not contend that his defense would have changed if he had known that George had voluntarily gotten into Barrow's van initially. His defense was not that the victim was not kidnapped, but that he was not involved in the kidnapping.

{¶67} The trial court's remedy for the discovery issue was to recess to allow defense counsel to meet with Detective Hilbert and to allow counsel to fully cross-examine the detective on the matter. We note that Buck's counsel expressed no dissatisfaction following his discussion with Detective Hilbert. And Buck has failed to demonstrate that he was prejudiced by the alleged discovery violation. Under these circumstances, we hold that the trial court did not abuse its discretion in handling the potential discovery violation. In addition, as we discuss in addressing Buck's third assignment of error, the trial court properly denied Buck's request for a mistrial.

{¶68} On appeal, Buck asserts that, in addition to failing to disclose the second George interview, the prosecutor perpetuated George's "false" narrative about being grabbed off the street in the bill of particulars and in his opening statement at trial.

{¶69} *The Bill of Particulars.* Under Crim.R. 7(E), upon request, "the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense." The limited purpose of a bill of particulars is "to elucidate or particularize the conduct of the accused," but not "to provide the accused with specifications of evidence or to serve as a substitute for discovery." *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). Under Crim.R. 33(E)(2), a variance between the allegations against the defendant and the evidence at trial is not reversible error unless the defense is prejudiced or misled thereby. "Even a significant factual flaw in the bill of particulars is not reversible error unless the defendant can establish prejudice wherein he was denied a fair trial." *State v. Montoya*, 12th Dist. Clermont No. CA2012-02-015, 2013-Ohio-3312, ¶ 24.

{¶70} In this case, the bill of particulars stated in part:

At approximately 7:00 P.M. on February 6, 2014, Defendants, acting as principal offenders and/or working in complicity with each other, * * * purposefully by force, threat or deception, removed Tyrelle George from the place where he was found or restrained him of his liberty for the purpose of holding him for ransom or as a shield or as a hostage.

Specifically, Defendants approached the victim as he was walking at or near 330 Forest in the District 4 area of Cincinnati. The victim was overpowered and was thrown into a vehicle. He was bound

18

and blindfolded and was then driven from the area to unknown locations.

{¶71} The essential elements of kidnapping and the conduct of the defendants were sufficiently spelled out in the bill of particulars: whether George had entered the van voluntarily or not, the defendants overpowered him, blindfolded him, and took him from the street where he had been. *See Sellards* at 171. Buck has not demonstrated that any variance between the evidence presented at trial and the bill of particulars regarding the manner in which George got into the van was misleading or impaired his ability to defend himself.

{¶72} *The Prosecutor's Opening Statement.* In opening statement, the prosecutor told the jury:

> Tyrell George will tell you that he walked out of his parents' house and was walking down the street * * * and a black van pulls up. * * * Mr. Barrow pulls the car up. Mr. Watson gets out as Mr. George is just walking down the street and grabs him and wrestles with him and throws him in the back of this van.

> And Mr. George is not a huge guy. Looks like he's in pretty good shape to me. He's not going quietly. He's frightened and he's trying to get away. They're trying to put a blindfold on him. They're trying to tie him up. He's trying to resist.

{¶73} The prosecutor's opening statement was not evidence and his assertion that George was grabbed and thrown into the back of the van was contradicted by the evidence presented at trial. The trial court properly instructed the jury, "The important thing to remember about opening statements, opening statements are not evidence." We presume that the jury followed the court's instruction, and that it based its decision on the evidence presented at trial. Even if the prosecutor

misstated what the evidence would show, it did not deprive Buck of a fair trial. *See State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 145.

{¶74} *The Use of False Testimony.* Next, Buck contends that the prosecutor committed misconduct by "failing to correct" (1) George's "false" testimony that he had not been interviewed a second time by police, and (2) the "likely perjured testimony" of codefendant Rucker that the police had made no promises to him in exchange for his cooperation.

{¶75} In a claim of prosecutorial misconduct based on the use of false or perjured testimony, the defendant has the burden to "show that (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001), quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). Buck has not met this burden.

{¶76} At first, George denied that police had interviewed him a second time, but then said he could not remember, and then said he had talked to them a few days after it happened. "Mere inconsistencies in testimony do not establish the knowing use of false testimony by the prosecutor." *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 41, quoting *Monroe v. Smith*, 197 F.Supp.2d 753, 762 (E.D.Mich.2001). Additionally, the fact "that a witness contradicts [himself] or changes [his] story also does not establish perjury." *Id.*

{¶77} With respect to Rucker's denial that the police had made promises to him, Buck points to a statement in a presentence investigation report: "Detective Hilbert states that they were finally able to get one of the defendants to agree to a plea deal if he helped the investigation." The record reveals, however, that Detective Hilbert testified to the same information at trial to explain why Rucker had not been indicted for a firearm specification: "[Rucker was] a cooperating defendant in a kidnapping investigation and we used him as a witness in this case." And Rucker

acknowledged during his testimony that, while the police had made no promises to him, he hoped to avoid prison by testifying about his role in the kidnapping.

{¶78} Buck has failed to show that either George's or Rucker's testimony was false and, therefore, has failed to meet his burden to show that the prosecutor committed misconduct by knowingly using false or perjured testimony.

{¶79} Consequently, we hold that none of the actions by the prosecutor were improper, and therefore, did not amount to misconduct. *See Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, at ¶ 45. We overrule the second assignment of error.

### *Due Process*

{¶80} In his third assignment of error, Buck argues that he was denied a fair trial. He contends that the trial court: (1) ceased to be impartial after instigating a confrontation with his trial counsel and then conducting a hearing on the incident outside of his presence; (2) failed to investigate a potential conflict of interest between Buck and his codefendant's counsel; (3) failed to grant a mistrial after the prosecutor's misconduct; and (4) failed to record sidebar conferences. Buck claims that these failures denied him due process and resulted in an unfair trial.

{¶81} *Lack of Impartiality.* The record reveals that on the fifth day of the trial, the judge conducted an in-chambers discussion that occurred on the record and outside the presence of the jury at the request of Buck's defense counsel. The discussion centered on an incident that had just occurred outside the courtroom, wherein the trial judge angrily ordered defense counsel to the courtroom. Defense counsel took umbrage, and asserted that the judge had demonstrated bias. The judge explained that he had reacted in that manner because he was frustrated by counsel's tardiness, and apologized.

{¶82}  It is fundamentally unfair for a criminal defendant to be tried before a biased judge.  *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34, citing *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).  A trial before a judge that is not impartial results in structural constitutional error that would require reversal without resort to a harmless-error analysis.  *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001), citing *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶83}  The Supreme Court of Ohio has described judicial bias as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts."  *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

{¶84}  ***Confrontation and Hearing Outside Defendant's Presence.***  First, he points to the judge's angry confrontation with his defense counsel.  "[S]harp words spoken by a trial court to counsel do not by themselves establish impermissible bias. There is a 'modicum of quick temper that must be allowed even judges.' "  *Sanders* at 278, citing *United States v. Donato*, 99 F.3d 426, 434 (D.C.Cir.1996), quoting *Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 99 L.Ed. 11 (1954).  The United States Supreme Court has explained:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  * * *  *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at

courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky v. United States*, 510 U.S. 540, 555-556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

{¶85} In this case, even if the judge used profanity in speaking with defense counsel and expressed impatience with counsel, the episode occurred outside the courtroom and out of the jury's presence, and by itself demonstrated no bias or partiality of the judge.

{¶86} Buck also complains that he was denied due process because he was not present at the in-chambers discussion about the incident between the trial judge and defense counsel. He argues that he was entitled to be at the discussion because it was a critical stage of the trial.

{¶87} While a criminal defendant has a fundamental right to be present at all critical stages of his trial, *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 100; Article I, Section 10, Ohio Constitution; Crim.R. 43(A), prejudicial or constitutional error does not necessarily result from the defendant's absence. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 139; *State v. Green*, 90 Ohio St.3d 352, 371, 738 N.E.2d 1208 (2000). "[I]n certain circumstances, a defendant's absence from a discussion at which his counsel are present does not offend due process." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 50, citing *United States v. Gagnon*, 470 U.S. 522, 527, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).

{¶88} Buck has failed to establish that he suffered any prejudice from not being present for this in-chambers and on-the-record discussion. Moreover, Buck implicitly waived his presence for the discussion because it occurred and was recorded at the request of defense counsel, who was authorized to waive Buck's presence. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d

959, ¶ 122, quoting *Gagnon* at 528 (the trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend").

{¶89} *Conflict of Interest with Codefendant's Counsel.* Next, Buck argues that the trial court failed to investigate a potential conflict of interest between Buck and his codefendant's trial counsel, who had once represented Buck in a criminal case. Buck asserts that the court's failure to investigate the conflict arising from counsel's successive representation of him and then Barrow denied him a fair trial.

{¶90} A trial court has a duty to inquire into a potential conflict only where it knows or reasonably should know of an attorney's possible conflict of interest in the representation of a criminal defendant. *State v. Gillard*, 78 Ohio St.3d 548, 552, 679 N.E.2d 276 (1997); *Mickens v. Taylor*, 535 U.S. 162, 168, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). This "is not to be confused with when the trial court is aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation.' " *Mickens* at 168-169, quoting *Cuyler* at 348.

{¶91} The court's failure to conduct the inquiry, however, does not require a reversal unless an actual conflict is found. *Gillard* at 552. An actual conflict may be found where counsel actively represents conflicting interests. *State v. Manross*, 40 Ohio St.3d 180, 182, 532 N.E.2d 735 (1988). "Conflicts may arise when an attorney simultaneously represents clients with different interests (multiple representation), or when an attorney representing a defendant has previously represented co-defendants or trial witnesses (successive representation)." *Moss v. United States*, 323 F.3d 445, 459 (6th Cir.2003), quoting *United States v. Shepard*, 675 F.2d 977 979 (8th Cir.1982). "It is more difficult for a defendant to show that counsel actively

represented conflicting interests in cases of successive rather than simultaneous representation." *Id.*

{¶92} Here, on the tenth day of trial, just before closing arguments, Buck's counsel informed the court that Buck had just told him that Barrow's counsel had represented him nine years earlier. At that point, Barrow's counsel told the court that he could not recall if he had represented Buck. The trial court expressed skepticism about the timing of Buck's concern because the trial was in its second week and because Barrow's counsel had been involved in the case for quite some time. The court pointed out that Barrow testified that Buck had had nothing to do with the charged offense and that Barrow's counsel had done nothing to try to incriminate Buck. Buck's response was that he had not realized earlier that there was a potential conflict.

{¶93} Buck has not demonstrated that he was prejudiced as a result of Barrow's counsel's representation of him nine years earlier. At most, he claims that if he had testified, "it would have behooved co-defendant's counsel to press Mr. Buck to testify that a staged kidnapping is in fact what took place—a proposition that would have been directly contradictory to Mr. Buck's defense." But Buck did not testify, and any potential effect of the previous representation is speculative. Therefore, the trial court did not err by failing to further investigate the matter.

{¶94} *Failure to Grant a Mistrial.* Buck also argues that the trial court erred by denying his motion for a mistrial because the prosecutor purposely failed to disclose the second police interview with George. He asserts that he was deprived of the opportunity to cross-examine George on the discrepancies between the two interviews.

{¶95} The decision whether to grant or deny a mistrial "lies within the sound discretion of the trial court." *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623

(1995). A mistrial should be declared only when justice requires and when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

{¶96} As we have stated, a trial court has discretion in determining a sanction for a discovery violation. *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, at ¶ 33. *See* discussion at ¶ 65.

{¶97} At the close of the state's case, Barrow's defense attorney moved for a mistrial on the basis that he had believed that the police had only interviewed George once, and that Barrow had been prejudiced as a result. Buck's defense attorney joined in the motion, but offered no argument. We note that it is not clear from the record that the prosecutor had not disclosed the second interview to Buck because his attorney never made such a representation to the court.

{¶98} The prosecutor responded that he had had meetings with the defense and had provided them with all the information that he had. He said that he and Detective Hilbert had communicated the substance of the second interview to Barrow's prior counsel. He said that Barrow's trial counsel had told him that Barrow's prior counsel had gotten rid of his case file, so the prosecutor did his best to ensure that both defense counsel had all of the information that had been previously disclosed.

{¶99} The trial court denied the motions for a mistrial, stating that while there was a discrepancy as to "who knew or who didn't know and what was turned over to prior counsel," the defense had adequately dealt with what they had learned about the second interview.

{¶100} When the codefendant's counsel asserted surprise at the second interview, the court noted that there had been no assertion that the prosecutor willfully withheld the information and that it may have been provided to prior defense counsel. The court recessed so that defense counsel could meet with the prosecutor and Detective Hilbert to discuss the content of the second interview and

allowed counsel to cross-examine the detective about whether the interview had been withheld.

{¶101} Buck asserts, for the first time on appeal, that the late disclosure prevented him from cross-examining Detective Hilbert about the discrepancies between the two interviews. He does not say how the discrepancies would have aided his defense. According to Detective Hilbert, there were no discrepancies, just new information about a prearranged marijuana sale. And Buck's counsel had already begun cross-examining the detective about the drug deal before Barrow's counsel asserted surprise at another interview.

{¶102} At trial, Buck's counsel raised no concern about discrepancies between the two interviews. Rather, he explained to the trial court that the only discrepancies he wanted to explore were those between George's first interview and his trial testimony. Under these circumstances, we cannot say that the trial court abused its discretion by overruling Buck's motion for a mistrial related to the alleged discovery violation. Buck has failed to establish that a fair trial was no longer possible.

{¶103} *Failure to Record Sidebar Conferences.* Buck complains that the trial court denied his right to a public trial and violated Crim.R. 22 by failing to record all of the sidebar conferences. During recesses throughout the trial, the court summarized the content of preceding sidebar conferences, and then asked whether the parties had additions or corrections to make to the summaries. Defense counsel did not object to this procedure.

{¶104} Crim.R. 22 requires the trial court to record all proceedings (including sidebar conferences) in serious-offense cases, and the court's summary of sidebar conferences in lieu of a recording is error. *State v. Simmons*, 2014-Ohio-3695, 19 N.E.3d 517, ¶ 80 (1st Dist.); *State v. Davis*, 1st Dist. Hamilton No. C-130198, 2014-Ohio-794, ¶ 13. However, the defendant must show prejudice from the failure to

record, especially where the defendant fails to object to the procedure used the by trial court. *Simmons* at ¶ 81.

{¶105} In this case, defense counsel was given an opportunity to comment on the trial court's summary, to add anything counsel wanted, to clarify the summary, or to object to it in any way. Counsel did not do so, and we therefore presume the summaries are accurate.

{¶106} If Buck believed that the trial court's summaries were inaccurate, he had the burden to supplement the record. Where a trial court fails to record sidebar conferences, the defendant bears the burden of reconstructing the off-the-record discussion pursuant to App.R. 9(C). *Davis* at ¶ 14. In this case, by failing to supplement the record with an alternative statement of what transpired, Buck has accepted the trial court's summaries as accurate representations of what occurred during the unrecorded sidebar conferences. *Id.*

{¶107} The trial court erred by failing to record the sidebar conferences. But because Buck has failed to demonstrate any resulting prejudice, we overrule the third assignment of error.

### Tattoo Evidence

{¶108} In his fourth assignment of error, Buck argues that the trial court erred by admitting into evidence two photographs of his tattoos, over his objection. One photograph depicted a shirtless Buck with multiple tattoos on his arms and upper body. The second photograph depicted a tattoo of a gun on Buck's left forearm. The tattoo was described at trial as a hand on the trigger of a pistol-grip shotgun, with smoke coming from its barrel, above the words "by all means." Buck contends that both photographs were irrelevant, and that even if relevant, their probative value was substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

{¶109} The admission of evidence is within the sound discretion of the trial court. *See State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 61. We will not disturb a trial court's ruling on evidentiary issues on appeal absent an abuse of discretion and proof of material prejudice. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181; *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 116. An abuse of discretion occurs if the trial court's decision is "unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶110} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *McKelton* at ¶ 144, citing Evid.R. 402 and 403(A).

{¶111} Courts have found evidence that a defendant has a particular tattoo to be relevant for various purposes. For example, tattoo evidence may be relevant to the identification of the defendant. *McKelton* at ¶ 195-196; *State v. Doan*, 12th Dist. Clinton No. CA97-12-014, 2000 WL 221963, *14 (Feb. 28, 2000). Or to rebut a defendant's statements. *State v. Adams*, 12th Dist. Butler No. CA2009-11-293, 2011-Ohio-536, ¶ 35; *State v. Chisolm*, 9th Dist. Lorain No. 05CA008782, 2006-Ohio-5051, ¶ 22. Or to establish motive. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 75; *State v. Jenkins*, 4th Dist. Lawrence No. 05CA7, 2006-Ohio-2546, ¶ 53.

{¶112} In this case, we find that the tattoo evidence meets none of these relevance criteria and that the court abused its discretion in admitting the photographs. *See State v. Huff*, 145 Ohio App.3d 555, 566, 763 N.E.2d 695 (1st Dist.2001). Even if the tattoo evidence was relevant, if it invites the jury to draw an

improper inference about the defendant's character, its probative value may be substantially outweighed by the danger of unfair prejudice. *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 196. In this case, any probative value that the tattoo photographs may have had was substantially outweighed by the danger of unfair prejudice because the photographs may have encouraged the jury to draw an improper inference about Buck's familiarity with guns and his willingness to use firearms to commit crimes. *See id.* at ¶ 196 ("straight killer" tattoo showed the defendant's "comfort with death and guns" and may have led to an improper inference that he committed murders). The trial court abused its discretion in admitting the tattoo photographs. *Id.*

{¶113} Even so, we hold that the error in the admission of the photographs was harmless because there is no reasonable probability that the evidence contributed to Buck's conviction. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 28. Given the overwhelming evidence of Buck's guilt, we cannot say that but for the tattoo photographs, the outcome of the trial would have been different. *McKelton* at ¶ 197; *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50, citing *State v. Harris,* 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37. We overrule the fourth assignment of error.

### Jail-Time Credit

{¶114} In his fifth assignment of error, Buck argues that his sentence was contrary to law because the trial court failed to properly calculate jail-time credit to include the days that he was held on a parole holder predicated solely on the kidnapping offense. *See State v. Gonzales*, 11th Dist. Ashtabula No. 2016-A-0048, 2017-Ohio-2720. The state concedes the error. *See State v. Bowden*, 1st Dist. Hamilton No. C-140462, 2015-Ohio-3740, ¶ 18 (trial court's failure to include the

appropriate amount of jail-time credit in the sentencing entry is plain error). The state agrees that Buck is entitled to 761 days of jail-time credit.

{¶115} Therefore, we vacate Buck's sentence in part, and we remand the cause for the sole purpose of including 761 days of jail-time credit in the sentencing entry.

### *Conclusion*

{¶116} Accordingly, we vacate Buck's sentence in part, and we remand the cause for the proper inclusion of jail-time credit. The trial court's judgment is affirmed in all other respects.

Judgment affirmed in part, sentence vacated in part, and cause remanded.

**MOCK, P.J.,** and **ZAYAS, J**., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.