[Cite as *State v. Svoboda*, 2021-Ohio-4197.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-190752 |
| | | C-190753 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-1800423 |
| | | B-1804429 |
| vs. | : | |
| SCOTT SVOBODA, | : | |
| | | *O P I N I O N.* |
| Defendant-Appellant. | : | |

Criminal Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal:  December 1, 2021


*David P. Fornshell,* Warren County Prosecuting Attorney, and *Kiersten A. Brandt*, Assistant Prosecuting Attorney, Special Prosecutor, for Plaintiff-Appellee,

*Bryan R. Perkins*, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1}    In January 2018, defendant-appellant Scott Svoboda was indicted in the case numbered B-1800423 ("B423") for three counts of rape, two counts of sexual battery, and two counts of gross sexual imposition.  In August 2018, he was indicted in the case numbered B-1804429 ("B429") for two counts of rape and two counts of gross sexual imposition. All charges relate to the sexual abuse of his minor stepdaughter, A.S., over a ten-year period.  After a jury trial, Svoboda was convicted of all counts. He has appealed, raising 15 assignments of error for our review.  We overrule all assignments of error and affirm the judgments of the trial court.

### *Factual Background*

{¶2}    Debra Svoboda is A.S.'s mother.  A.S. is Debra's child from a previous relationship.  J.S. is Svoboda's child from a previous relationship.  After Debra and Svoboda married, they had I.S. and L.S. together.

{¶3}    A.S. testified that Svoboda started sexually abusing her when she was six years old and the family was living on Glenhurst Place, in Hamilton County, Ohio.  She testified that the abuse was "constant," and he touched the outside and inside of her vagina at least 60 times at that house. She testified that one time she tried to fight back and he hit her and knocked the wind out of her, so she learned not to fight back.

{¶4}    The family moved to Cardiff Avenue when A.S. was nine years old.  A.S. claimed the sexual abuse escalated at that location.  She testified that Svoboda started to put his mouth and his tongue on the outside and inside of her vagina.  The abuse was routine and would happen in her room and on the couch.  A.S. estimated

that Svoboda performed cunnilingus on her at least 80 times while the family lived on Cardiff Avenue.

{¶5}    The family moved to Forest Road when A.S. was ten years old.  A.S. testified that the abuse continued to escalate.  Svoboda would remove his pants, but keep his boxers on, and would "cuddle" with her, try to put his penis between her legs, and would make her rub his penis until he ejaculated. She testified that the cunnilingus abuse continued as well.

{¶6}    When A.S. was 12 years old, the family moved to a house on Forest Lake Drive.  A.S. testified that the abuse escalated to anal rape at this address.  She recalled an event where she was in her room watching a Star Wars movie that Svoboda had recently purchased for her, and, while she lay on her stomach, Svoboda put his penis into her anus.

{¶7}    A.S. testified that when she was 12 years old, her stepbrother J.S. told Svoboda that she had been "flashing" boys.  A.S. denied it, but Svoboda became angry with her and called her a "slut."  A.S. testified that the hypocrisy of that statement made her so angry she told her mother about the abuse.  Debra did not get angry like A.S. thought she would.  A.S. testified that Svoboda grabbed her by the shoulders and told her, like he had in the past, that if she ever told anyone about the abuse again he would ruin her life, her siblings' lives, and her mother's life.  A.S. then told Debra that she had lied about the abuse.

{¶8}    A.S. testified that shortly after her recantation, Debra walked in on Svoboda abusing her.  A.S. was trying on a bathing suit in her room when Svoboda came in and began to perform cunnilingus on her.  A.S. testified that after Debra walked in, she "bolted" out of the room.  Svoboda chased after her.  She testified that

Debra came back into her room and yelled at her for wearing a bathing suit in the house.

{¶9}    The family moved to Wanninger Lane when A.S. was 16 years old.  A.S. testified that at this location Svoboda digitally penetrated her, performed cunnilingus on her, and touched her breasts on multiple occasions.  She identified three separate places in the home where he would perform cunnilingus on her—in her room, in Svoboda and Debra's room, and on the couch in the living room.

{¶10}  On January 14, 2018, A.S. was texting Svoboda while she was at work. The text conversation concerned A.S. being prevented from going on a ski trip due to poor grades. Svoboda had told her that she could go, but then texted her to tell her that Debra had decided she was still grounded and could not go.  Svoboda offered to talk to Debra about getting the punishment lifted. A.S. testified that Svoboda had done this kind of thing before—manipulate Debra to get A.S. in trouble and then offer to help A.S. get out of trouble if she had sex with him.  A.S. testified that she became angry with Svoboda's abuse and the control he had over her life.

{¶11}  In response to Svoboda's offer to help get her out of trouble, A.S. texted, "or yes, 'talking.' As you're trying to get into my pants, I think you should try again with mom."  A.S. testified that she put "talking" in quotes because "talking" was code for Svoboda having sex with her.  The text conversation continued:

Svoboda: Whoa [A.S.]!

A.S.: Yep.

Svoboda: That's taking it too far. I wasn't even going there, dude.

A.S.: You should talk to mom again.

4

Svoboda: I don't understand why I am getting crapped on. All I'm trying to do is give you what you want, and you're talking about wrecking homes and shit...

A.S.: No. You wrecked a home. All of my anger stems from you and your stupid decisions. And I think because of that you should be willing to help.

Svoboda: I've been offering to help the whole time you've been grounded and never brought up talking about anything. I've tried and tried, and you said no a dozen times. Didn't mean to upset you at work or make you mad. I even offered to let you do stuff even when I told J-man no. How is that not trying to help you?

A.S.: I'm still grounded. Don't sorry kiddo me. And don't try to act like the good guy. Talk to mom again.

Svoboda: I will but don't expect things to change. She is pretty set on proving a point about your grades. I can say sorry because I didn't ground you guys, nor did I make the decision that you can't go. But I'm the bad guy.

A.S.: You molested me. Yes, you're the bad guys [sic].

{¶12} After that message, A.S. disclosed the abuse to her manager at work. A.S.'s boyfriend A.W. came to her work and she told him about the abuse. A.W. took A.S. to see her aunt and uncle, Chris and Sarah Nesbitt, and A.S. told them about the abuse. They then took A.S. to the police station. She was interviewed by detectives and they took pictures of her text conversation with Svoboda, which were admitted as state's exhibits six A-E.

5

{¶13} During the time she was at the police station, Svoboda sent a series of messages to which A.S. did not respond because she had turned her phone off. Detectives asked A.S. to continue her text conversation with Svoboda in an effort to obtain incriminating evidence. After she turned her phone back on, the following messages came through:

Svoboda: I will talk to her and see what I can do. Stop talking about all this and getting upset

Svoboda: You also promised you'd never say anything and look at it now

Svoboda: You're right. I shouldn't have offered to help. I take it back and I'm sorry.

Svoboda: Who got you in driving school? Who takes you driving?

Svoboda: Since I'm the bad guy I will stop all of it

Svoboda: Please let me know when you will be off. I still would like to have you do some night driving, if that's okay with you…

Svoboda: Hey, I think you can go Friday. I wish you would've let us know you were going with Sarah

Svoboda: I did exactly what you told me to [A.S.]. I hope this isn't going to be trouble, babe

A.S. responded: Do you really think night driving is going to make up for the last ten years?

Svoboda: That's not the implication I was making

Svoboda: I'm doing exactly what you told me to. I really didn't mean to upset you over this and I'm really sorry I did

A.S.: Are you even sorry for taking advantage of me for years?

Svoboda: You don't know how sorry I am

Svoboda: That's why I wasn't even bringing that up today... seriously, I wasn't... you flipped on me and brought it al [sic] up. I asked if you wanted help, I never said if you want to talk about it... I wasn't trying to hurt you [A.S.]

A.S.: I flipped because you took advantage of me. How could you do that to me

Svoboda: I wasn't even going there [A.S.]. I never meant to hurt you and I don't want to keep upsetting you. You should enjoy your time with Sarah. I'm sorry I upset you and hurt you. I promise that I am

A.S.: I cry myself to sleep at night.

Svoboda: [A.S.] please understand that I don't want you upset. I'm so sorry for hurting you or upsetting you in any way

Svoboda: I told you a while ago never again on any of that and I thought you understood. I didn't mean to bring any of this up today and it's certainly not what I was asking of you. I just wanted an idea as to how to get you what you wanted to do on Friday night. I didn't mean for you to get upset and all this to come up

A.S.: I told you to stop touching me years ago but you didn't, when will it stop

Svoboda: It is stopped. I promise. Please [A.S.], calm down and don't be upset. I want you to enjoy your time with Sarah and not be thinking about all this

Svoboda: You knew that. I didn't even bring it up.

{¶14} According to state's exhibit five, the report which extracted the text messages from A.S.'s cell phone, Svoboda sent two additional messages.

Svoboda: I don't even know why we are still talking about it or why you're saying all this. I'm sorry if I upset you especially today when you were at work. I really don't want you upset or hurting. Please [A.S.]...

Svoboda: Hey, sorry to bug you. I wanted you to know that I do try to make up for anything I did wrong. We live in Anderson because you wanted to stay here. Nobody else really cared but I knew you did so I keep ya here. Every time I walk past your room I ask if you need anything or if you're okay. I fill your bottle, make ya food. I take you driving and do my best to make sure all that's handled for you. Oh [sic] really don't NEED for anything in life. I always try to make sure you're covered on anything and everything no matter what. I will always go above and beyond for you. Even after you move out I said I'd help you with getting settled for college and life. I said things would stop and I meant it. But understand I do love you and the other kids and your mom very much and if I have to spend forever trying to make up for it then that's what I'll do ... sorry again [A.S.] if you're still upset

{¶15} I.S., A.S.'s brother, was permitted to testify outside the courtroom via live video. He was 11 years old at the time of trial. He recounted an incident he witnessed between Svoboda and A.S. while the family lived on Wanninger Lane. He had just gotten home from school and peeked into A.S.'s room to tell her that he was home. He testified that he saw Svoboda and A.S. on the bed and Svoboda was touching her "boobs."

{¶16} Debra partially corroborated A.S.'s story regarding the bathing suit incident. She testified that shortly after A.S.'s initial allegation and subsequent recantation she walked into A.S.'s room and saw Svoboda on his knees in front of A.S. When he saw her he "jumped up" and followed her out of the room "rambling about something." Debra denied seeing any sexual contact. She testified that at the time she thought they were just talking, but later realized that she had walked in on Svoboda sexually abusing A.S.

{¶17} N.B. testified that she is a family friend and A.S. used to babysit her. N.B. described an incident that occurred when she was approximately ten or 11 years old and her family and the Svoboda family went to a local park to play. A.S. and Svoboda were not with them. After a while at the park, the group returned to the Svoboda home and continued to play outside. N.B. went inside to get a drink of water. She testified that while she was inside, Svoboda came up behind her, grabbed her by the arm, and pulled her into the hallway. She testified that he looked scared and his face was white. He asked her if she had heard anything. She testified that he said something about A.S. and then told her that if she told anybody he was going to kill her.

{¶18} K.B. is N.B.'s mother and a friend of Svoboda and Debra. She testified that a few days after A.S. told police about the abuse, she had a phone conversation with Svoboda. Svoboda told her that he had deleted "a bunch of stuff" from his phone.

{¶19} Detective Andrew Stoll testified that he called Svoboda and asked him to come to the police station for an interview. When Svoboda arrived 40 minutes later, Stoll asked him for his cell phone. Svoboda claimed that he had lost his cell

phone on the way to the police station. Stoll testified that when he confronted Svoboda with the text messages between him and A.S. from January 14, 2018, Svoboda admitted that he had sent the messages.

{¶20} Andrea Powers testified as an expert witness in forensic interviewing. She interviewed A.S. in January 2018 at the Mayerson Center for Safe and Healthy Children ("Mayerson Center") at Cincinnati Children's Hospital. She testified that a "grooming process" often occurs when the abuser is a family member or a person of authority. The abuser will "test the victim to see how they'll respond, and then that kind of gears them towards continuing different types of abuse." She testified that this process was labeled the "Accommodation Syndrome" by Dr. Roland C. Summit (a.k.a child sexual abuse accommodation syndrome "CSAAS").

{¶21} Powers identified several components of CSAAS. One is "secrecy," where the abuser tells the victim that it is their secret, and if the victim tells anyone then they will get in trouble. Powers testified that this may include a threat to the victim, e.g., "If you tell, I'll go to jail, you'll get in trouble, no one will believe you." Next, there is "helplessness," which occurs when the victim tries to protect herself and it doesn't work, leaving the victim to feel as though there is nothing in her power that she can do. The third component is "entrapment." The victim focuses on surviving the abuse because she feels like she has no power or control. The fourth component is "delayed disclosure." Powers testified that "delayed disclosure" of sexual abuse is "actually very common." "There is [sic] a number of reasons why kids may not disclose. One can be that they are threatened not to, one can be to keep it a secret, it's not always threatening. Some kids feel that they're powerless and will doubt if someone will believe them." Powers testified that if a victim is close to the

abuser, the disclosure can be "very much delayed. It can be weeks, months, even years." Finally, there is "recantation." Powers testified that victims will falsely recant for a number of reasons, including if the nonoffending caregiver does not believe the victim, or out of fear of what may happen to the victim or her family.

**{¶22}** The defense strategy was to demonstrate that A.S. and Svoboda had a normal, loving relationship and that A.S. was manipulative and had lied in the past about being abused in order to get her way.

**{¶23}** Svoboda testified and denied that any abuse occurred. J.S. and Svoboda's mother and sister testified that A.S. and Svoboda had a loving relationship. They testified that A.S. sought out Svoboda's affection, asking him for massages and to carry her on his back, even during her high school years. They also identified certain behaviors by A.S. they found troubling, like her ability and willingness to cry on command and, according to Svoboda's mother, at times being "all over" Svoboda.

**{¶24}** The defense called an expert witness in developmental psychology to rebut Powers's testimony. Dr. Kamala London Newton[1] raised concerns with Powers's reliance on CSAAS. She testified that the "big problem" was that CSAAS was based solely on Dr. Summit's treatment of adult patients and was not based on any "systemic evidence." She testified that she disagreed with CSAAS's premise that there is a syndrome-like cluster of symptoms that characterize children who have been abused. She also disagreed with the beliefs that sexually-abused children often deny the abuse when confronted about it and falsely recant allegations of abuse. Dr.

---

[1] During her testimony she stated that "Dr. London" is her professional name.

London admitted, however, that it is common for children to delay disclosure of sexual abuse.

### *Thirteenth Assignment of Error*

{¶25} For ease of discussion, we discuss the assignments of error out of order. In his thirteenth assignment of error, Svoboda challenges the sufficiency of the evidence that led to his convictions.

{¶26} The test for determining the sufficiency of the evidence is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. Scott,* 1st Dist. Hamilton Nos. C-200385 and C-200403, 2021-Ohio-3427, ¶ 23, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  It is a question of law for the court to determine, the court is not to weigh the evidence. *Scott* at ¶ 23.  "When evidence is susceptible to more than one construction, a reviewing court must give it the interpretation that is consistent with the judgment." *Id.*, quoting *In re J.C.,* 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

### B-1800423

{¶27} The B423 indictment charged Svoboda with seven offenses that were alleged to have occurred between January 2010 and December 2017.  To prove that Svoboda committed rape in counts one and two, the state was required to prove that Svoboda engaged in sexual conduct with A.S., who was under 13 years of age, whether or not Svoboda knew her age.  *See* R.C. 2907.02(A)(1)(b).  To prove rape in count three, the state had to prove that Svoboda, by force or threat of force, compelled A.S. to engage in sexual conduct.  *See* R.C. 2907.02(A)(2).

{¶28} To prove sexual battery in counts four and five, the state was required to prove that Svoboda engaged in sexual conduct with A.S., and Svoboda was the natural parent, or adoptive parent, or stepparent, or guardian, or custodian, or person in loco parentis of A.S. *See* R.C. 2907.03(A)(5).

{¶29} Count six required the state to prove that Svoboda purposely compelled A.S., by force or threat of force, to engage in sexual contact. *See* R.C. 2907.05(A)(1). Count seven required the state to prove that Svoboda had sexual contact with A.S. and A.S. was under 13 years of age, whether or not Svoboda knew her age. *See* R.C. 2907.05(A)(4).

{¶30} Svoboda does not dispute his status as A.S.'s stepfather or her age at the time of the offenses. He does not make any specific arguments regarding counts one, two, four, and seven. After a review of the record, the evidence on those counts was sufficient.

{¶31} Svoboda argues that for counts three, five, and six, A.S. never testified to specific, distinguishable instances of abuse. The trial court merged count five with count three. Therefore, Svoboda was never convicted of count five, and we confine our analysis to count three. *See State v. Carmen*, 1st Dist. Hamilton No. C-120692, 2013-Ohio-3325, ¶ 9. A.S. testified that Svoboda performed cunnilingus on her and touched her breasts multiple times and in at least three different locations around the time frames alleged in counts three and six, providing sufficient evidence on those counts.

### B-1804429

{¶32} The B429 indictment charged Svoboda with four offenses that were alleged to have occurred between August 2007 and August 2008. All four counts

relate to abuse that occurred when A.S. was six years old and the family lived on Glenhurst Place.

{¶33} In counts one and two, the state alleged that Svoboda, by force or threat of force, compelled A.S. to engage in digital penetration. *See* R.C. 2907.02(A)(2). In counts three and four, the state alleged that Svoboda engaged in sexual contact with A.S. and A.S. was less than 13 years of age, whether or not Svoboda knew her age. *See* R.C. 2907.05(A)(4).

{¶34} Svoboda contends that the state failed to prove that he penetrated A.S. as charged in counts one and two. *See* R.C. 2907.01(A) (in order to prove that Svoboda engaged in "sexual conduct," the state was required to prove "[p]enetration, however slight").

{¶35} A.S. testified that Svoboda put his fingers "towards the upper part on the vagina on the inside of, like, the skin there." Thus, A.S.'s testimony provided sufficient evidence of penetration. *See State v. Strong*, 1st Dist. Hamilton Nos. C-100484 and C-100486, 2011-Ohio-4947, ¶ 54 ("[P]enetration of the labia was sufficient to prove penetration of the vagina for purposes of satisfying the element of sexual conduct as defined in R.C. 2907.01(A) * * * the labia is the anterior of the female genital organ.").

{¶36} Although not specifically raised by Svoboda, there is another sufficiency issue we must resolve. Counts one and two alleged digital penetration during the same time period. Counts three and four alleged sexual contact during the same time period. There must be sufficient evidence that two distinct instances of digital penetration occurred and two distinct instances of sexual contact occurred.

{¶37} A.S. testified that it "started with him touching my vagina outside of my underwear. And then sometimes he would go inside my underwear to touch my vagina. And that is usually what happened there."

{¶38} A.S. described how he touched her "towards the upper part on the vagina on the inside of, like, the skin there." When asked if he would say anything, A.S. answered, "Not all the time, no, he wouldn't all the time. It depended on my reaction to it. At the beginning it was squirming and, you know, there is only so much a six year old can do, and his fingers really hurt, because they were so rough and it hurt." She also testified that sometimes her pants would stay on and he would reach his hand down her pants and sometimes he would take her pants off. She testified that the abuse was constant and that it occurred at least 60 times at the house on Glenhurst Place.

{¶39} A.S.'s testimony provided sufficient evidence of two distinct instances of sexual contact and two distinct instances of digital penetration. The thirteenth assignment of error is overruled.

### Fourteenth Assignment of Error

{¶40} In his fourteenth assignment of error, Svoboda contends that his convictions were against the manifest weight of the evidence. In reviewing a claim that a conviction is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact, in resolving conflicts in the evidence, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

Reversal of a conviction and a grant of a new trial should only be done in the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶41}** "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

**{¶42}** Svoboda's manifest-weight challenge generally attacks A.S.'s credibility. First, he takes issue with the timing of the disclosure. Before A.S. disclosed the abuse, she had been told that she would not be permitted to go on the ski trip with her friends. After she disclosed the abuse, she was permitted to go. A.S. explained that Svoboda would manipulate Debra into punishing her, and then he would come to the rescue. Her explanation was supported by Debra, who testified that Svoboda would tell her that A.S. needed to be disciplined for something. She would punish A.S., such as by grounding her. Then, after a couple of days, Svoboda would tell her that A.S. had been really good and they should remove the punishment.

**{¶43}** Second, Svoboda argues that A.S. made false allegations against him and her great-grandfather in the past. A.S. explained that she recanted her initial allegation against Svoboda because he threatened her. Regarding the allegations against her great-grandfather, in December 2017, A.W. had become concerned with A.S.'s mood and demeanor and asked her if she had been sexually abused. A.S. told him that she had been sexually abused, but by her great-grandfather. A.S. testified that she had not actually been abused by her great-grandfather, but that she was aware of family rumors that her great-grandfather had abused other children, and she was scared of identifying Svoboda as her abuser. She testified that she thought

16

that by identifying her now-deceased great-grandfather she could avoid hurting anyone.

{¶44} Third, Svoboda argues that A.S.'s behavior toward him contradicted her allegations of abuse. He specifically points to A.S. requesting that he give her piggy-back rides and leg massages, and how she would "cuddle" with him on the couch. A.S. denied requesting those things; Svoboda would do them and she wouldn't say no. A.S. testified, "When you're ashamed of what someone is doing to you, you don't want to draw attention to that."

{¶45} Finally, Svoboda points to inconsistencies between A.S.'s testimony and her statements to detectives and Andrea Powers. In her interviews, A.S. did not mention that Svoboda had hit her, anally raped her, or that he had ejaculated when she rubbed his penis with her hand. A.S. testified that she was never asked during the interviews about Svoboda hitting her, so she did not bring it up. She testified that she was disgusted and embarrassed by the ejaculation, and so she did not disclose it to the detectives and denied it when asked by Powers. Her reasoning for not disclosing the anal rape was similar—she was scared and ashamed.

{¶46} A.S.'s testimony was not the only evidence against Svoboda. The text messages proved to be damning evidence of his guilt. Add to that the fact that Svoboda claimed he lost his phone on the way to the police station and admitted to K.B. that he had deleted "a bunch of stuff" from his phone, and the testimony of other witnesses, especially I.S., Powers, Debra, and Detective Stoll. The totality of this evidence leads us to conclude the jury did not clearly lose its way and create a manifest miscarriage of justice. The fourteenth assignment of error is overruled.

*First Assignment of Error*

{¶47}  In his first assignment of error, Svoboda contends that his due-process rights were violated and he was denied the effective assistance of trial counsel due to the state's confiscation and search of his legal paperwork.  He urges us to reverse the trial court's judgments and dismiss the indictments on that basis.

{¶48}  On April 11, 2019, the assistant prosecutor assigned to Svoboda's case was listening to a jail call between Svoboda and his sister when she came to believe that Svoboda was in possession of a transcript of A.S.'s Mayerson Center interview with Powers.  According to the assistant prosecutor, she provided the interview recording to defense counsel marked "for counsel only."[2]  The court reporter prepared a transcript of the interview at the state's request and provided defense counsel with a copy of the transcript.  The assistant prosecutor suspected that defense counsel had violated Crim.R. 16(C) by giving the interview transcript to Svoboda or members of his family.  According to her affidavit, the assistant prosecutor discussed the quandary with her supervisor and the "ethical hotline" and general counsel for the Cincinnati Bar Association.  After getting the okay from her supervisor, the assistant prosecutor requested that Svoboda's jail cell be searched for a copy of the transcript.

{¶49}  On April 12, 2019, a Hamilton County Sheriff's Deputy searched Svoboda's cell and removed all of his legal paperwork.  Surveillance footage from the jail showed that the deputy took the paperwork to an office unmonitored by security

---

[2] Pursuant to Crim.R. 16(C), the prosecuting attorney may designate discovery material as " 'counsel only' by stamping a prominent notice on each page or thing so designated." "Except as otherwise provided, 'counsel only' material may not be shown to the defendant or any other person, but may be disclosed only to defense counsel, * * * and may not otherwise be reproduced, copied or disseminated in any way. Defense counsel may orally communicate the content of the 'counsel only' material to the defendant." Crim.R. 16(C).

cameras. Approximately 15 minutes later, the deputy left the office to meet the assistant prosecutor and brought her back to the office. The deputy and assistant prosecutor were in the office for approximately 17 minutes while the assistant prosecutor searched the paperwork. She did not find a copy of A.S.'s interview transcript. After the assistant prosecutor left, the deputy returned the paperwork to Svoboda's cell.

{¶50} On April 15, 2019, the parties gathered for trial, but the court continued the case to the next day because the assistant prosecutor informed the court that the state believed defense counsel had violated Crim.R. 16(C). On April 16, 2019, the assistant prosecutor explained to the court her suspicion that defense counsel had provided Svoboda or members of his family with a copy of the transcript from A.S.'s interview. Defense counsel denied any wrongdoing and informed the judge of the seizure and search of Svoboda's legal paperwork. Defense counsel told the court that he learned that the state had searched Svoboda's cell on the same day as the search. However, he explained that when he called the assistant prosecutor that day, she told him the search was unrelated to the prosecution.

{¶51} Svoboda's counsel filed a motion to disqualify the assistant prosecutor, claiming that Svoboda's legal paperwork contained notes taken during meetings with defense counsel discussing trial preparation and strategy. The state filed a motion in response and a motion for contempt against defense counsel for violating Crim.R. 16(C).

{¶52} On June 7, 2019, the parties appeared at a hearing to discuss the pending motions. The assistant prosecutor's supervisor represented the state. The assistant prosecutor did not appear at the hearing. The supervisor stated that the

assistant prosecutor, in the presence of the sheriff's deputy, "leafed" through Svoboda's legal paperwork in a cursory manner. He stated that she was looking only for the transcript, which would have been easily identifiable and distinguishable from Svoboda's legal paperwork. He claimed that she did not examine the content of Svoboda's papers, did not take any notes, and did not make any copies. The supervisor stated that the assistant prosecutor had not gained any information about any of Svoboda's privileged communications.

{¶53} Nevertheless, the state agreed to the appointment of a special prosecutor and withdrew its motion for contempt. Defense counsel agreed to withdraw his motion to remove the assistant prosecutor, and agreed not to relitigate the issue with the special prosecutor. On July 10, 2019, in a written entry, the trial court stated that a special prosecutor would be appointed, and "the parties contemplate and agree that the Sixth Amendment claims and discovery issues which underlied the above motions will not be relitigated."

{¶54} Two months later, on September 11, 2019, Svoboda filed a motion to dismiss the indictments on the grounds that the assistant prosecutor's search of his legal paperwork violated his Sixth Amendment rights. The state did not file a motion in opposition. The court denied the motion.

{¶55} A special prosecutor from Warren County was appointed to try the case. The special prosecutor told the court, "I know nothing about anything that was recovered from the Defendant's jail cell. Nothing has been provided to me, from any of the information and the stuff that I had received in this case, that came from the Defendant's jail cell. To me, it was as if the Defendant's jail cell was never searched

because there is nothing in our file that would indicate [sic]. In fact, everything that I have is stuff that pertains prior to that."

{¶56} Implicit within the meaning of the constitutional right to counsel is the right of a criminal defendant to consult privately with his attorney. *State v. Milligan*, 40 Ohio St.3d 341, 342, 533 N.E.2d 724 (1988). The leading case concerning the Sixth Amendment consequences of government intrusions into attorney-client communications is *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

{¶57} In *Weatherford*, an undercover government informant (Weatherford) attended two meetings between defendant Bursey and his defense counsel, making him privy to attorney-client communications regarding trial preparation. *Weatherford* at syllabus. The state called Weatherford to testify against Bursey at his criminal trial, and he was convicted. After serving his sentence, Bursey brought a claim under 42 U.S.C. 1983 against Weatherford, arguing that Weatherford's attendance at his attorney-client meetings deprived him of a fair trial and the effective assistance of counsel. *Id.*

{¶58} The United States Supreme Court rejected Bursey's claims. It concluded that Weatherford had communicated nothing to his superiors or the prosecution about Bursey's trial plans or the upcoming trial. *Id.* at 556. Weatherford's testimony related only to events prior to the meetings and referred to nothing that was said at the meetings. *Id.* at 558. None of the state's evidence arose out of conversations between Bursey and defense counsel, and none of the conversations overheard by Weatherford were used to the "substantial detriment" of Bursey. *Id.* at 554-555.

{¶59} In *Milligan*, a jail director secretly recorded a conversation between the defendant and his attorney and provided the recording to the sheriff. *Milligan,* 40 Ohio St.3d at syllabus, 533 N.E.2d 724. After determining that a violation of Milligan's Sixth Amendment rights had occurred, the Ohio Supreme Court held that "neither mere suppression [of the illegally obtained information] nor automatic dismissal [of the indictment] is appropriate in every case irrespective of the circumstances." *Id.* at 343-344.

{¶60} In order to determine an appropriate remedy for the Sixth Amendment violation, the court adopted the test announced in *Weatherford*, which requires analysis of four factors:

(1) whether the government deliberately intruded in order to obtain confidential and privileged information, (2) whether the government obtained directly or indirectly any evidence which was or could be used at trial as a result of the intrusion, (3) whether any information obtained was or could be used in any manner detrimental to the defendant, and (4) whether details about trial preparation were learned by the government.

*Id.* at 344; *accord State v. George,* 1st Dist. Hamilton No. C-030216, 2004-Ohio-2868, ¶ 29.

{¶61} The court concluded that "where the unauthorized interception of a private conversation between a criminal defendant and his attorney results in substantial prejudice to the defendant in preparation of his defense, the trial court may in the exercise of sound discretion, take such action as is appropriate, including dismissal of the indictment." *Milligan* at 344.

**{¶62}** The court noted that unless the attorney-client communication is recorded:

> [T]estimony relative to what was actually overheard necessarily depends upon knowledge possessed solely by the testifying officer. Consequently, under such circumstances, it would be extremely difficult if not impossible for the defendant to demonstrate actual knowledge on the part of the officer of information prejudicial to his case.

*Id.* at 345. Thus, the court held that when knowledge of information prejudicial to the defendant's case is "within the exclusive control of the government, the burden is upon the state, after a prima facie showing of prejudice by the defendant, to demonstrate that the information gained was not prejudicial to the defendant." *Id.*

**{¶63}** The court highlighted the unique prejudice that comes with the interception of defense trial strategy information. "Since the information obtained would in most cases not be admissible evidence, it is contended the motivation for obtaining such information would be to obtain a tactical advantage at trial or to secure other information which would lead to apparently untainted evidence." *Id.* at 344.

**{¶64}** Svoboda contends that it would be difficult, if not impossible, for a court to know if the prosecution gained an advantage by knowing the defense strategy or whether evidence that appears untainted, but was obtained due to the interception of confidential communications, was used by the prosecution. Thus, Svoboda reasons, once the prosecution has gained access to the defense strategy, there is prejudice per se and any conviction that follows is tainted. He cites *United States v. Levy*, 577 F.2d 200, 210 (3d Cir.1978), *Caldwell v. United States*, 205 F.2d

879, 881 (D.C.Cir.1953), and *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir.1995). However, the approach followed by those cases was rejected by the Ohio Supreme Court in *Milligan*, which favored a case-by-case analysis. *Accord State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 144, quoting *United States v. Steele*, 727 F.2d 580, 586 (6th Cir.1984), citing *United States v. Morrison*, 449 U.S. 361, 365-366, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted.").

{**¶65**} In the present case, there was no recording or surveillance footage of the assistant prosecutor's search for the trial court to review. From the surveillance footage we do have, we know that she had access to the paperwork for approximately 17 minutes. Because there is no recording that could tell us what the assistant prosecutor learned during her search, this case falls under the type described in *Milligan* where burden-shifting is appropriate once Svoboda has made a prima facie showing of prejudice. Svoboda has made such a showing by submitting an affidavit in which he stated that the documents taken from his jail cell contained notes relating to cross-examination of witnesses, trial preparation and strategy, and his own preparation to testify. *See State v. Svec*, 9th Dist. Lorain No. 18CA011341, 2020-Ohio-6793, ¶ 27-29 (indicating that the defendant may have made a prima facie showing of prejudice if he had submitted affidavits in support of his assertion that he and his attorney discussed trial strategy during the intercepted phone calls).

{**¶66**} Nevertheless, we hold that the appointment of the special prosecutor neutralized any possible prejudice. The special prosecutor, as an officer of the court, stated during a hearing that as far as he was concerned, "it was as if the Defendant's

24

jail cell was never searched. * * * In fact, everything that I have is stuff that pertains prior to that."

{¶67} Where a violation has occurred, the remedy must be tailored to fit the injury and should not unnecessarily infringe on competing interests (e.g., defendant's right to counsel and a fair trial versus society's interest in the administration of justice). *Morrison*, 449 U.S. at 364, 101 S.Ct. 665, 66 L.Ed.2d 564. The proper approach is to "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id.* at 365. According to the United States Supreme Court in *Morrison*:

> The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.
>
> More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.

*Id.*

{¶68} The automatic-dismissal rule Svoboda urges us to adopt does not fit with the Ohio Supreme Court's precedent in *Milligan* or the United States Supreme

25

Court's precedent in *Morrison*, which demonstrate a preference for case-by-case analysis.

**{¶69}** We must pause and state that we do not condone the assistant prosecutor's reckless and misguided actions in any way. How she or her supervisor could believe that searching Svoboda's private legal paperwork was the right way to handle her suspicion that defense counsel violated Crim.R. 16(C) is beyond this court's comprehension. Nevertheless, dismissal of the indictments in this case would be too extreme of a sanction in light of the special prosecutor's representations to the court.

**{¶70}** Because we find that, on this record, the appointment of the special prosecutor purged any taint, the first assignment of error is overruled.

### Second and Third Assignments of Error

**{¶71}** The second and third assignments of error relate to Svoboda's attempts to obtain surveillance videos of the seizure of his legal paperwork. Through subpoenas and a motion to compel, Svoboda sought the videos to verify the representations made by the state regarding the timing and scope of the assistant prosecutor's search. Svoboda also sought to use the videos in his case-in-chief. The trial court denied the motion and subpoenas. The videos were preserved, and Svoboda's appellate counsel had access to them for purposes of appeal, but the footage was not provided to trial counsel. Svoboda argues that this violated his right to compulsory process and amounted to a suppression of evidence favorable to him, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Svoboda argues that the jury was entitled to know that the prosecution

had stolen Svoboda's defense strategy before the trial. Svoboda contends that the videos would have allowed him to "impeach the credibility of the prosecution itself."

{¶72} The Compulsory Process Clause of the Sixth Amendment, "at a minimum," grants criminal defendants "the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

{¶73} Due process requires that the prosecution disclose to the defense evidence that is material either to guilt or to punishment. *Brady* at 87.

{¶74} The videos show when Svoboda's paperwork was confiscated, how long the assistant prosecutor had access to the paperwork, and when the paperwork was returned. While the videos would have been helpful to Svoboda's trial counsel in litigating the pretrial motions pertaining to the prosecutor's search of Svoboda's legal paperwork, they are irrelevant to the question of Svoboda's guilt or punishment. Therefore, the court's denial of Svoboda's subpoenas and motion to compel did not violate the Compulsory Process Clause or the Due Process Clause. The second and third assignments of error are overruled.

### *Fourth Assignment of Error*

{¶75} In his fourth assignment of error, Svoboda argues that the trial court violated his constitutional right to confront witnesses against him by allowing I.S. to testify remotely via live video.

{¶76} Before we address the merits of his Confrontation-Clause argument, we must address the "law-of-the-case doctrine." The state first brought up the issue of I.S. testifying remotely with Judge Metz, the original trial judge. After a hearing,

Judge Metz denied the state's request. Later, after Judge Metz recused himself, the issue was raised again with Judge Allen, the new trial judge. Judge Allen reversed course and ruled that I.S. would be permitted to testify via live video. Svoboda argues that Judge Allen's ruling violated the law-of-the-case doctrine.

{¶77} The law-of-the-case doctrine "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). The doctrine includes a lower court's adherence to its own prior rulings or to the rulings of another judge or court in the same case. *Poluse v. Youngstown*, 135 Ohio App.3d 720, 725, 735 N.E.2d 505 (7th Dist.1999).

{¶78} The doctrine's purpose is to ensure "consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution." *Nolan* at 3. It is a "rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results." *Id.* The doctrine "should not be taken to imply that a trial court can never, under any circumstances, reconsider its prior ruling." *Poluse* at 725, quoting *Clymer v. Clymer*, 10th Dist. Franklin No. 95APF02–239, 1995 WL 571445, *3 (Sept. 26, 1995).

{¶79} "An order granting or denying a motion *in limine* is a tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated." (Emphasis sic.) *State v. Grubb*, 28 Ohio St.3d 199, 203, 503 N.E.2d 142 (1986), quoting *State v. White*, 6 Ohio App.3d 1, 451 N.E.2d 533 (8th Dist.1982), paragraph two of the syllabus. *Accord State v. Smith*, 1st Dist. Hamilton No. C-180227, 2020-

Ohio-649, ¶ 13, quoting *Grubb* at 201-202 ("It is well-established that 'a motion in limine, if granted, is a tentative, interlocutory, precautionary ruling by the trial court.' It reflects the court's anticipatory treatment of the evidentiary issue, and in virtually all circumstances, finality does not attach when the motion is granted.").

{¶80} The state's motion related to the procedure by which evidence would be presented. Therefore, it may be characterized as a motion in limine, and Judge Allen was free to revisit Judge Metz's ruling. The law-of-the-case doctrine was not violated.

{¶81} Next, we turn to Svoboda's Confrontation-Clause arguments. Ohio, like many states, has a statute that allows alleged child victims to testify outside the physical presence of the defendant if certain conditions are met. R.C. 2945.481. The trial court must find that one of the following three factors exists:

> (1) the persistent refusal of the child victim to testify despite judicial requests to do so; (2) the inability of the child victim to communicate about the alleged violation or offense because of extreme fear, failure of memory, or another similar reason; [or] (3) the substantial likelihood that the child victim will suffer serious emotional trauma from so testifying.

R.C. 2945.481(E). A reviewing court will affirm the trial court's determination under R.C. 2945.481 if its findings are supported by competent, credible evidence. *State v. Armstrong*, 1st Dist. Hamilton No. C-100509, 2011-Ohio-6265, ¶ 13.

{¶82} Svoboda argues that I.S. does not qualify as a "victim" for purposes of R.C. 2945.481 and that none of the factors in subsection (E) were met.

{¶83}  This court has applied a broad definition of "victim" as it pertains to R.C. 2945.481. "A child who witnesses the sexual abuse of another child can be a victim within the meaning of the statute." *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 28 (1st Dist.); *see* Ohio Constitution, Article I, Section 10a(D) (defining "victim" as "a person against whom the criminal offense or delinquent act is committed or who is directly and proximately harmed by the commission of the offense or act."). I.S. falls under the definition of "victim" for purposes of R.C. 2945.481.

{¶84}  At the evidentiary hearing conducted on the matter by Judge Metz, the state's witnesses discussed I.S.'s difficulty speaking about his father. He was described as having a visceral, physical response when Svoboda was brought up and had difficulty even talking about him.  Additionally, Svoboda is alleged to have physically abused I.S. as documented in a dependency action initiated by the Hamilton County Department of Job and Family Services.  There was competent and credible evidence to support Judge Allen's finding that R.C. 2945.481(E) had been satisfied, despite Judge Metz's finding to the contrary.

{¶85}  Finally, Svoboda argues that application of R.C. 2945.481 to his case violated his rights under the Confrontation Clause.  The Confrontation Clauses of the United States and Ohio Constitutions were enacted to secure the defendant the opportunity for cross-examination.  *State v. Self*, 56 Ohio St.3d 73, 76, 564 N.E.2d 446 (1990). Thus, while a defendant is ordinarily entitled to face-to-face confrontation at trial, it "is not the sine qua non of the confrontation right." *Id.* at 77. "[P]hysical confrontation may constitutionally be denied where the denial is

necessary to further an important public policy and the reliability of the testimony is otherwise assured." *Id.*

{¶86} "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The rights included in the Confrontation Clause include not only a personal examination, but also (1) that the witness give testimony under oath, (2) the defendant be permitted to cross-examine the witness, and (3) the jury be able to observe the demeanor of the witness. *Id.* at 845-846.

{¶87} I.S. testified under oath, was subject to cross-examination by defense counsel, and he and Svoboda could see each other through the video feed. The trial transcript is not clear as to whether the jury could see I.S., but Svoboda does not claim they could not. Because we find no violation of the United States or Ohio Confrontation Clauses, the fourth assignment of error is overruled.

### Fifth and Sixth Assignments of Error

{¶88} Svoboda's fifth and sixth assignments of error relate to Andrea Powers's testimony as an expert witness in forensic interviewing. In his reply brief, Svoboda argues for the first time that Detective Stoll vouched for the credibility of Powers and A.S. We decline to consider this argument. *See Calex Corp. v. United Steelworkers of Am.*, 137 Ohio App.3d 74, 80, 738 N.E.2d 51 (7th Dist.2000), citing App.R. 16.1(C) ("A reply brief may not raise new assignments, which were omitted from appellants' original brief, especially where leave to file a new assignment was not sought from this court.").

{**¶89**} We review the admission of expert testimony for an abuse of discretion. *State v. Howard*, 1st Dist. Hamilton Nos. C-190451 and C-190452, 2020-Ohio-5072, ¶ 23.

{**¶90**} First, Svoboda contends that Powers did not satisfy the requirements of Evid.R. 702 to testify as an expert witness in forensic interviewing. As relevant here, Evid.R. 702 provides the following requirements a witness must meet in order to testify as an expert witness:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{**¶91**} Powers testified that she has worked as a social worker at Cincinnati Children's Hospital for 25 years and a forensic interviewer for the Mayerson Center for seven years. She testified that she received a master's degree in social work, has completed specialized training regarding interviewing children who allege sexual abuse, and stays up to date on professional literature related to forensic interviewing. She is a member of the National Association of Social Workers and is certified in forensic interviewing by the National Children's Advocacy Center and the Ohio Network of Children's Advocacy Centers. She testified that she has conducted over 2,100 forensic interviews with children who have alleged physical or sexual abuse.

**{¶92}** Svoboda provides no argument as to how Powers failed to meet the requirements of Evid.R. 702. The trial court did not abuse its discretion in qualifying Powers as an expert witness.

**{¶93}** Next, Svoboda argues that Powers indirectly vouched for A.S.'s credibility. He appears to confuse bolstering a witness's testimony with supporting testimony from an expert with vouching. Bolstering is permitted, vouching is not. In *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998), the Ohio Supreme Court held that an expert witness may testify that the behavior of an alleged child victim is consistent with behavior observed in other sexually-abused children. The court distinguished "expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." *Id.* at 262. An expert may not offer an opinion as to the truth of the child's statements. But testimony which provides "additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity," is permitted. (Emphasis sic.) *Id.* at 263.

**{¶94}** Powers's testimony falls under the latter category. She did not testify as to the veracity of A.S.'s statements. She explained why certain behaviors, such as delayed disclosure and recantation, occur in child-sexual-abuse cases. *Contrast Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, at ¶ 33-34 (where the trial court clearly erred by allowing a social worker and the child's therapist to testify that the child had not been coached and was telling the truth about the abuse); *Stowers* at 262 (it would be error to admit testimony that a child has not been programmed or that it does not appear as though the child is fantasizing).

{¶95} Finally, Svoboda contends that Powers's testimony was unreliable because of her reliance on child sexual abuse accommodation syndrome ("CSAAS") in formulating her conclusions.

{¶96} In *Stowers,* the defendant argued the expert witness should not have been permitted to testify about the behavior of child-sexual-abuse victims because "there is no child sexual abuse syndrome officially recognized by the psychiatric profession." *Stowers* at 261. The majority found, however, that the expert was qualified under Evid.R. 702 and permitted her to testify that recantation and delayed disclosure of abuse "are seen in children that have been sexually abused." *Id.* at 263. The court noted that "such testimony is permitted to counterbalance the trier of fact's natural tendency to assess recantation and delayed disclosure as weighing against the believability and truthfulness of the witness." *Id.*

{¶97} Justice Resnick dissented and was joined by Justices Douglas and Pfeifer. Justice Resnick wrote that such testimony should inadmissible "until it is scientifically established that there are proven and accepted behavioral characteristics of a standard child-sexual-abuse victim." *Id.* at 264 (Resnick, J., dissenting).

{¶98} This court has consistently applied *Stowers* and has not discussed CSAAS in depth. *See, e.g., State v. Netherland*, 132 Ohio App.3d 252, 258, 724 N.E.2d 1182 (1st Dist.1999); *State v. Rucker*, 1st Dist. Hamilton No. C-110082, 2012-Ohio-185, ¶ 39. However, in recent years, courts in other states have raised concerns with CSAAS. In 2018, New Jersey joined Kentucky, Tennessee, and Florida in barring CSAAS testimony, with a limited exception for testimony relating to delayed disclosure. *See State v. J.L.G.,* 234 N.J. 265, 288, 190 A.3d 442 (2018); *King v.*

*Commonwealth*, 472 S.W.3d 523, 530 (Ky.2015) ("[M]any times the Commonwealth has attempted to prove its case using CSAAS evidence at trial, but not once has the Commonwealth attempted to prove at a *Daubert* hearing the scientific reliability and validity of the CSAAS theory."); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993) ("Research has led us to conclude that no one symptom or group of symptoms are readily agreed upon in the medical field that would provide a reliable indication of the presence of sexual abuse."); *Hadden v. State*, 690 So.2d 573, 579 (Fla.1997) ("[W]hile the debate continues among experts regarding whether the child sexual abuse accommodation syndrome is an adequate therapeutic tool for determining the presence of abuse, there is no consensus among experts that it is useful as substantive evidence of guilt."); *see also Friedman v. Rehal*, 618 F.3d 142, 157 (2d Cir.2010), fn. 9 (characterizing CSAAS as "highly controversial").

{¶99} The New Jersey Supreme Court acknowledged that in 1993, like most courts in the nation, it determined that CSAAS testimony was admissible. But, "[t]oday, we have the benefit of more critical and thorough scientific analysis of CSAAS, which cautions against its continued use." *J.L.G.* at 308.

{¶100} The court discussed in detail the problems with CSAAS and its five component behaviors—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction (a.k.a. "recantation"). *Id.* at 282. The court's basic concerns included a "lack of data supporting CSAAS," and the fact that it is not recognized in the Diagnostics and Statistical Manual of Mental Disorders ("DSM") or by the American Psychiatric Association, American Psychological Association, or the American Psychological Society. *Id.* at 291-292.

35

{**¶101**} The main proponent of CSAAS, Dr. Summit, believed that false recantation was the norm. The court found significant disagreement among the scientific community on this issue. *J.L.G.,* 234 N.J. at 296, 190 A.3d 442. Recantation rates varied among studies. The court discussed a 2005 article in which the authors' survey of studies revealed a recantation rate of between four and 27 percent, although they concluded that the studies showing higher recantation rates were associated with cases with the least certain diagnoses of sexual abuse. *Id.*, citing Kamala London, Maggie Bruck, Stephen J. Ceci & Daniel W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?,* 11 Psychology, Pub. Policy, & Law 194 (2005). The authors also concluded that recantation was uncommon. *Id.* The state's expert witness, Dr. Thomas Lyon, coauthored a study that found a recantation rate of 23 percent. *J.L.G.* at 297. Thus, researchers agree that recantation happens in a minority of cases, but they disagree on the rate.

{**¶102**} The court found denial to be another heavily debated topic. *Id.* at 297. The studies that found higher rates of denial were of questionable validity. *Id.* at 298. The 2005 article referenced above concluded that when directly questioned in a formal setting, only a small percentage of children deny abuse. *Id.* at 298.

{**¶103**} The court did find, however, that there was consistent and long-standing support in the scientific community for the belief that most children delay disclosure of sexual abuse. *Id.* at 294.

**{¶104}** Ultimately, the court held that expert testimony relating to CSAAS did not satisfy the *Frye* standard and rejected its use.[3]  *Id.* at 303. The court made an exception for delayed-disclosure testimony, which may be admissible to dispel misconceptions about delayed reporting.  *Id.* at 303-304.  However, the court wrote that it had "serious concerns about the admissibility of expert testimony on delayed disclosure in this case because [the victim], a teenager, gave reasons for the delay that were not beyond the ken of the average juror." *Id.* at 306.

**{¶105}** Turning to the present case, the primary behaviors addressed by Powers were delayed disclosure and recantation.  Svoboda's own expert, Dr. London, agreed that delayed disclosure is common.  Combine that with the "consistent and long-standing" support for Powers's testimony on the subject, and it is apparent that it was not an abuse of discretion for the trial court to admit Powers's testimony regarding delayed disclosure. Powers's testimony regarding recantation is more controversial in light of Dr. London's testimony on the subject and further study of CSAAS, which indicates to us that perhaps Justice Resnick's concerns in *Stowers* were valid. *See Stowers*, 81 Ohio St.3d at 264, 690 N.E.2d 881; *J.L.G.,* 234 N.J. at 296, 190 A.3d 442.[4]  Regardless, we cannot say that the trial court abused its discretion in admitting Powers's testimony when its admission was clearly supported by the Supreme Court's holding in *Stowers*.  The fifth and sixth assignments of error are overruled.

---

[3] The *Frye* standard requires the court to determine whether the science underlying the proposed expert testimony has "gained general acceptance in the particular field in which it belongs." *J.L.G.* at 280, quoting *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). Ohio, however, has rejected the *Frye* standard and adopted the standard announced by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 687 N.E.2d 735 (1998). Thus, Ohio courts must determine whether the "witness's testimony is based on reliable, scientific, technical, or other specialized information." *Id.* at 610, citing Evid.R. 702.
[4] Perhaps, sometime in the near future, the Ohio Supreme Court will agree to revisit this issue in light of the numerous other state courts that have rejected CSAAS expert testimony.

### Seventh Assignment of Error

{¶106} In his seventh assignment of error, Svoboda argues that the text messages identified as exhibits five and six A-J were never properly authenticated by a representative of the cell phone company, were hearsay, and violated his right to confront the witnesses against him.

{¶107} Svoboda testified that the exhibits about which he complains were in fact text messages sent between him and A.S. The messages sent by Svoboda were admissible as nonhearsay because they represented admissions by a party-opponent. *See* Evid.R. 801(D)(2)(a). A.S.'s messages were admissible in order to provide the proper context to understand Svoboda's messages. Finally, even if we were to find that the messages were testimonial in nature, Svoboda's right to confrontation was not violated because A.S. testified at trial about the text messages and was subject to cross-examination. *See State v. Williams*, 2017-Ohio-8898, 101 N.E.3d 547, ¶ 13 (1st Dist.). The seventh assignment of error is overruled.

### Eighth Assignment of Error

{¶108} In his eighth assignment of error, Svoboda argues that the trial court erred in admitting other-acts evidence, specifically A.S.'s testimony regarding an incident when she was home alone at the house on Forest Lake Drive and police officers showed up to evict the family from the house. He complains that the purpose of this testimony was to portray him as a bad father unable to provide for his family. He cites the prosecutor's statement in closing argument: "[Svoboda] wants you to believe that he had absolute love and affection for, this child that he left in a house for sheriff's deputies to show up and escort her out as they were being evicted because of his decision making."

{¶109} Svoboda did not object to A.S.'s testimony. Therefore, we review only for plain error. *See State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 81. To prevail on a claim that the trial court committed plain error, Svoboda must show that (1) an error occurred, (2) the error was obvious, and (3) it affected the outcome of the trial. *See id.*

{¶110} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 21, quoting Evid.R. 404(B). But other-acts evidence is admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis deleted.) *Hartman* at ¶ 22, quoting Evid.R. 404(B).

{¶111} The state argues that the eviction served as an important temporal landmark in the family history, which helped A.S. identify when specific instances of abuse occurred. This could be a proper basis upon which to admit the testimony, but the state's assertion is undercut by the prosecutor's statement during closing argument where he inferred that Svoboda's actions belied his claims that he loved A.S. and would never sexually abuse her.

{¶112} But even if we were to find A.S.'s testimony to be bad-acts evidence, its admission was not obvious error that affected the outcome of the trial. Svoboda was accused of repeatedly raping his stepdaughter for ten years. Evidence that he was irresponsible or reckless with his money was not so prejudicial as to rise to the level of plain error.

{¶113} Svoboda also points to A.W.'s testimony that A.S. had developed a physical reaction (a "tick") in response to hearing Svoboda's name as further evidence that the state sought to convict Svoboda on the basis that he was a bad father. However, this testimony has nothing to do with other-acts evidence. The eighth assignment of error is overruled.

### Ninth Assignment of Error

{¶114} Svoboda argues in his ninth assignment of error that the state committed prosecutorial misconduct through its role in the first, second, third, fourth, fifth, sixth, seventh, and eighth assignments of error.

{¶115} "Generally, prosecutorial misconduct will not provide a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the appellant of a fair trial." *State v. Simmons*, 2014-Ohio-3695, 19 N.E.3d 517, ¶ 72 (1st Dist.).

{¶116} Svoboda has failed to demonstrate that the special prosecutor committed any misconduct during the trial. The ninth assignment of error is overruled.

### Tenth Assignment of Error

{¶117} In his tenth assignment of error, Svoboda argues that his rights to due process and a fair trial were violated because the jury viewed him in handcuffs being escorted by two sheriff's deputies.

{¶118} On the second day of trial, defense counsel informed the court that there had been "two incidents where jurors have seen Mr. Svoboda escorted from the courtroom, both in handcuffs and with two deputies. * * * [O]ne happened on Tuesday, the other happened early Wednesday morning when two jurors saw,

perhaps more. Quite frankly, I don't know how many other people may have seen him escorted from court." The basis of counsel's statements was Svoboda's belief that the jurors had seen him. Counsel moved for a mistrial on the basis that Svoboda could no longer receive a fair trial.

{¶119} We review the grant or denial of a motion for a mistrial for an abuse of discretion. *State v. Buck*, 2017-Ohio-8242, 100 N.E.3d 118, ¶ 95 (1st Dist.).

{¶120} "A jury may develop prejudice against a defendant tried while shackled, and that circumstance should be avoided when possible. But it is well accepted that the danger of that prejudice 'is slight' where a juror's view of a defendant in custody is 'brief, inadvertent and outside of the courtroom.' " *State v. English*, 1st Dist. Hamilton No. C-180697, 2020-Ohio-4682, ¶ 83, citing *State v. Kidder*, 32 Ohio St.3d 279, 285-286, 513 N.E.2d 311 (1987).

{¶121} In *Kidder*, the defendant was observed shackled in the hallway outside the courtroom by one juror. *Kidder* at 285. The court denied defense counsel's request that the court conduct a voir dire of the juror to determine whether she was prejudiced by what she had seen. *Id.* Instead, the court gave a curative jury instruction: "I want to reiterate the instructions that I have given to you before. That anything that you saw or heard outside of this Courtroom related to this case should be deleted from your mind. You determine this case on what you see and hear in this Courtroom and nothing else." *Id.*

{¶122} Based on the limited description provided by defense counsel, if any members of the jury did see Svoboda in handcuffs and escorted by deputies, their viewing of him was brief and inadvertent, having only occurred while he was escorted from the courtroom. Furthermore, the court instructed the jury generally to

decide the case based upon the facts and the jury instructions and not to be swayed by sympathy or prejudice.

{¶123} Svoboda has failed to show that the court abused its discretion in denying his motion for a mistrial. The tenth assignment of error is overruled.

### *Eleventh Assignment of Error*

{¶124} In his eleventh assignment of error, Svoboda argues that the time periods of the offenses alleged in the indictments were overbroad and nonspecific, preventing him from presenting an effective defense and violating his right to due process. He claims that he likely had an alibi defense for several of the charges, but the broad timeframes in the indictments made that defense useless.

> Under the United States and Ohio Constitutions, an individual accused of a felony is entitled to an indictment setting forth the "nature and cause of the accusation." The government must aver all material facts constituting the essential elements of the offense so that the accused not only has adequate notice and an opportunity to defend but also may protect himself from any future prosecution for the same offending conduct. * * * Precise dates and times are not essential elements of offenses, and the failure to provide them is not fatal to the indictment. "Large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements."

*Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, at ¶ 41-42, quoting *State v. Sellards*, 17 Ohio St.3d 169, 170, 478 N.E.2d 781 (1985), and *State v. Morgan*, 12th Dist. Brown Nos. CA2009-07-029 and CA2009-08-033, 2010-Ohio-1720, ¶ 12.

{¶125} "In many cases involving the sexual abuse of children, the victims are simply unable to remember exact dates, especially where the crimes involve a repeated course of conduct over an extended period of time." *State v. See*, 1st Dist. Hamilton Nos. C-190251 and C-190252, 2020-Ohio-2923, ¶ 17, quoting *Rucker,* 1st Dist. Hamilton No. C-110082, 2012-Ohio-185, at ¶ 43.

{¶126} Child-sex-abuse cases can involve broad time periods. *See, e.g., See* at ¶ 19 (one year); *State v. Barnecut*, 44 Ohio App.3d 149, 152, 542 N.E.2d 353 (5th Dist.1988) (one year); *State v. Mundy*, 99 Ohio App.3d 275, 296, 650 N.E.2d 502 (2d Dist.1994) (one year to five years); *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61 and 2013 CA 62, 2014-Ohio-3432, ¶ 12 (four years, seven years, and eight years).

{¶127} Although the indictment in B423 initially contained particularly broad time periods, the amendment on October 15, 2018, substantially narrowed the timeframes alleged. The broadest time period on any single charge was the one-year period alleged in count one. The four charges in B429 all involved the same one-year period. In the state's bill of particulars, it narrowed the time frame to approximately seven months. Also, the charges in B429 all relate to sexual abuse that occurred when A.S. was only six or seven years old.

{¶128} Svoboda has failed to show that the indictments were so broad that he was unable to effectively defend against the allegations. The eleventh assignment of error is overruled.

### Twelfth Assignment of Error

{¶129} In his twelfth assignment of error, Svoboda argues that the trial court erred by allowing the state to amend the timeframe alleged in count seven in B423.

{¶130} The original time period was January 1, 2008, to December 31, 2008. The state amended it to August 1, 2011, to May 31, 2012.

{¶131} Because the family moved frequently during A.S.'s childhood, the state tied instances of abuse to the locations at which they occurred. The original time period related to abuse that occurred while the family lived on Cardiff. The amended time period related to abuse that occurred three years later while the family lived on Forest Road.

{¶132} Generally, we review a trial court's decision to permit the amendment of an indictment for an abuse of discretion. *State v. Beach*, 148 Ohio App.3d 181, 2002-Ohio-2759, 772 N.E.2d 677, ¶ 23 (1st Dist.). However, where a defendant does not object to the amendment at the trial level, we review for plain error. *State v. Carter*, 89 Ohio St.3d 593, 598, 734 N.E.2d 345 (2000).

{¶133} A trial court "may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Crim.R. 7(D). If an amendment is made to the substance of the indictment or to cure a variance between the indictment and the proof, "the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, *unless* it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made * * *." (Emphasis added.) *Id.*

{¶134} The purpose of a grand jury indictment is to give notice to the accused: "A criminal offense must be charged with reasonable certainty in the indictment so

as to apprise the defendant of that which he may expect to meet and be required to answer; so that the court and jury may know what they are to try, and the court may determine without unreasonable difficulty what evidence is admissible."

*State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 10, quoting *Horton v. State*, 85 Ohio St. 13, 19, 96 N.E. 797 (1911).

{¶135} In *State v. Denkins*, 1st Dist. Hamilton No. C-030518, 2004-Ohio-1696, ¶ 25, the state was permitted to amend the time period to include dates one year earlier than in the original indictment.   The court determined that the amendment did not change the nature or identity of the charges, and the amendment occurred a year before trial, giving the defendant ample time to prepare his defense accordingly.  *Id.* at ¶ 28-29.

{¶136} The amendment did not change the identity of the charge or the nature of the conduct alleged.  The three-year difference between the original indictment and the amended indictment is significant, especially considering how the prosecution tied instances of abuse to the locations at which they occurred. However, in the B423 indictment, the grand jury was presented with evidence of multiple instances of abuse from 2010 to 2017.  That put Svoboda on notice of the conduct for which he was required to answer and greatly reduced the risk of him being found guilty on the basis of facts not presented to the grand jury. Furthermore, the amendment was made over a year prior to trial, which gave Svoboda time to adjust his defense strategy accordingly.

{¶137} The amendment to the indictment was not an obvious error that affected the outcome on count seven.  The twelfth assignment of error is overruled.

### Fifteenth Assignment of Error

{¶138} In his fifteenth assignment of error, Svoboda contends that his sentence was contrary to law because the trial court failed to consider the purposes and principles of felony sentencing in R.C. 2929.11 or the seriousness or recidivism factors in 2929.12. Svoboda also claims that the record does not support consecutive sentences, but he presents no argument on the matter.

{¶139} A trial court is not required to make specific findings regarding the principles and purposes of sentencing or the seriousness or recidivism factors. *State v. Jackson*, 1st Dist. Hamilton Nos. C-180245 and C-180246, 2019-Ohio-3299, ¶ 10. Indeed, where the record is silent, we presume the trial judge properly considered R.C. 2929.11 and 2929.12, and it is the defendant's burden to demonstrate otherwise. *Id.* At the sentencing hearing, the court stated that it had considered the mitigating and aggravating factors. Svoboda has failed to demonstrate that the court failed to comply with R.C. 2929.11 or 2929.12.

{¶140} Consecutive sentences are reviewed solely under R.C. 2953.08(G)(2)(a). *State v. Marshall*, 1st Dist. Hamilton Nos. C-190748 and C-190758, 2021-Ohio-816, ¶ 48, citing *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761, 141 N.E.3d 169, ¶ 16. Therefore, we only consider whether the record supports the sentencing court's findings under R.C. 2929.14(C)(4). *Marshall* at ¶ 48.

{¶141} The trial court made the required consecutive sentencing findings at the sentencing hearing and in the sentencing entry. The fifteenth assignment of error is overruled.

## *Conclusion*

{¶142} For the foregoing reasons, all fifteen assignments of error are overruled, and the judgments of the trial court are affirmed.

Judgments affirmed.

**ZAYAS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.