[Cite as *State v. Byers*, 2025-Ohio-2795.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240147 |
| | | TRIAL NO. B-2300264 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| EDWARD BYERS, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 8/8/2025 per order of the court.**

**By:**_____
         **Administrative Judge**

[Cite as *State v. Byers*, 2025-Ohio-2795.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                          :          APPEAL NO.   C-240147
                                                   TRIAL NO.    B-2300264
      Plaintiff-Appellee,          :

  vs.                                   :
                                                          *O P I N I O N*
EDWARD BYERS,                           :

      Defendant-Appellant.         :



Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 8, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Cochran Legal, LLC,* and *Colin P. Cochran*, for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** Defendant-appellant Edward Byers challenges his gross-sexual-imposition conviction on sufficiency and manifest-weight grounds in two assignments of error. Unpersuaded, we overrule his assignments of error. The victim's testimony describing the type, nature, and circumstances surrounding Byers's contact with the victim was sufficient to prove that Byers touched the victim's erogenous zone to achieve sexual arousal or gratification. Moreover, Byers's conviction is not against the manifest weight of the evidence simply because the trial court believed the victim's account over his account.

**{¶2}** We overrule the assignments of error and affirm the conviction.

## I.    Factual and Procedural History

**{¶3}** Byers was charged with one count of gross sexual imposition in violation of R.C. 2907.05(A)(4) based on his alleged sexual contact with a person under the age of 13 years old.

### Byers's trial

**{¶4}** At the bench trial, then-13-year-old J.J. testified that Byers and J.J.'s mother ("Mother") had been married but divorced in 2016 when J.J. was roughly three years old. While Byers is not J.J.'s biological father, and despite the divorce, J.J. and Byers continued their father-daughter relationship and saw each other weekly.

**{¶5}** J.J. described the night of her 11th birthday. After a pool party, she went to Byers's residence to spend the night. J.J. dozed off on the couch watching television and woke up sometime around 2:30 a.m. to Byers, on the couch near J.J.'s feet, with her "[toes] in his mouth." She clarified that Byers was "[l]icking my toes." Byers moved both of his hands under her shirt and bra, and "rub[bed]" her breasts. Byers told J.J. he loved her and went to his room.

*A. J.J.'s disclosure*

**{¶6}** J.J. initially testified that she had her phone but decided against calling her mother because J.J. "felt that she wouldn't believe me." But after J.J. finished testifying, the prosecutor disclosed to the trial court and Byers's counsel that, in a meeting, J.J. had explained that "she did call mom but didn't tell her what happened that night." J.J. was recalled to the witness stand and admitted to talking to her mother on the phone the morning after the incident. But J.J. insisted that she "didn't call [Mother]." Instead, Mother called her and J.J. did not disclose what happened.

**{¶7}** J.J. did not disclose the incident to her Mother—or anyone else—for more than a year because a relative "has been through this, and their mother didn't believe them." After the incident, J.J. returned to Byers's apartment multiple times. While she tried to resist with excuses for not going to Byers's residence, Mother made her go. J.J. testified that Mother sent J.J. to Byers's apartment when J.J. was in trouble.

**{¶8}** When J.J. was "kicked out of school" in November 2022, Mother threatened to send her to Byers's apartment. After some arguing, J.J. disclosed the touching to Mother because it "felt like it was time to get it out." J.J. did not "know if [Byers] was going to do it again or not" and "just didn't want to go" to his residence. In the ensuing months, Byers started calling J.J. "20 times a day." She answered once and told Byers she did not want to speak with him.

**{¶9}** Mother testified and recalled arguing with J.J. over sending her to Byers's residence and, after a brief pause, J.J. said, "[M]om, I just want to tell you why I don't want to go over my dad['s] house." J.J. "bust out crying and said that he was touching her." Mother took J.J. to Cincinnati Children's Hospital Medical Center ("Children's Hospital").

4

### B. *Mother messaged Byers*

**{¶10}** Mother confronted Byers about the disclosure over text messages and later turned those text messages over to law enforcement. Mother asked Byers if he licked J.J.'s toes, and Byers responded that it was "probably 1 of her dreams." He told Mother that J.J. "was feeling sick" and he "got the ointment out she rubbed on her chest & I did rub on her feet, she told me to stop and that was it."

**{¶11}** Later, Mother messaged Byers that J.J. was insisting that Byers inappropriately touched her and Mother did not "know w[h]at to believe." Mother told Byers, "[J.J.] said she still loves u and she hope u not mad at her." Byers responded that he hoped that "y'all not mad at me" and he never intended to hurt J.J. or Mother. Then, Byers messaged Mother, "I'm sorry for whatever, but I never meant to hurt y'all in no type of way no I feel like I'm a monster she don't wanna be around me outta nowhere, please don't let this mess up our relationship, like I said if we need some time off, Ima always be here."

**{¶12}** At trial, Mother questioned Byers's reaction and found it unfatherly. She also pointed out that Byers simultaneously accused J.J. of lying and apologized. The conversation ended with a text message from Byers insisting he wanted to be a part of J.J.'s life. Mother interpreted Byers's messages as denials. Based on her history with Byers, she never thought Byers would do anything inappropriate with J.J.

### C. *J.J.'s forensic interview*

**{¶13}** J.J. was interviewed by Stephanie Helton, a forensic interviewer at the Mayerson Center for Safe and Healthy Children, a division of Children's Hospital. Without any objection, the State played a recording of the entire interview. Byers did not object to Helton's designation as an expert in the field of forensic interviews. Helton described the forensic interview process and how children have difficulty

5

recalling specific details of traumatic events. She explained that disclosures are delayed for several reasons, including embarrassment, the child's relationship with the person, and "just not [feeling] ready to talk about what's happened."

**{¶14}** At a November 2022 interview, J.J. told Helton "that she woke up around 2 am and that [] Byers was licking her feet. And she told him to stop. And so he stopped. And then he put his hands underneath her shirt and touched her chest." J.J. said that her "head was hurting and her stomach was hurting" that night, and Byers stopped rubbing her chest after she asked to get a drink of water. J.J. told Helton that, despite the incident, there were times when she "wanted to go to dad's." In Helton's experience, J.J.'s desire to see Byers was normal.

**{¶15}** Helton also testified that the changes in J.J.'s demeanor during the interview were consistent with someone who has experienced a traumatic event. Helton concluded that J.J.'s disclosure "was consistent with the disclosure process of most sexual abuse victims" with whom Helton had worked. Helton concluded that J.J.'s disclosure was consistent with the fact that child sexual assault victims often continue feeling affection towards the perpetrator. Helton clarified that she was not opining on whether J.J. was truthful. Helton agreed that a person might delay their disclosure of an event because the event did not actually happen.

D. *Byers's interrogation*

**{¶16}** Detective Douglas was assigned to the case after her unit received a referral from Children's Hospital. Roughly seven months after Mother confronted Byers with J.J.'s accusation, a grand jury indicted Byers on one charge of gross sexual imposition. After he was apprehended, Douglas interviewed Byers and informed him that he had been charged with gross sexual imposition.

6

**{¶17}** In the interview, Byers told Douglas and another officer that after J.J.'s birthday party, he had been on the couch with J.J. in his apartment and J.J. had not been feeling well. He explained to the officers that he applied ointment to her feet, and she applied ointment to her chest. He denied any sexual contact with J.J.

E. *Byers testified in his defense*

**{¶18}** Byers testified that he has epilepsy, which affects his memory. He recalled feeling caught off guard by Mother's text messages. At some point, Byers deleted those text messages because he "keep[s] a phone clear and cleaned and organized." So, his testimony about those text messages was limited.

**{¶19}** Byers unequivocally denied the allegation that he had touched J.J.'s breasts. Byers testified that he was the disciplinarian between him and Mother, so J.J.'s accusation likely was an attempt to avoid being disciplined for getting in trouble at school.

**{¶20}** Byers recalled that, after J.J.'s birthday party, J.J. was in his apartment feeling unwell, and "fell asleep a little early." Byers explained that "one thing to help sleep is an ointment," Vicks VapoRub, which Byers applies to any part of his body that feels "uncomfortable." Byers said he rubbed Vicks VapoRub on J.J.'s feet and denied touching her chest. Byers "thought [J.J.] was old enough to manage" the ointment.

**{¶21}** The State asked Byers why he did not apply ointment to J.J.'s stomach or head, the areas that she identified to Helton as hurting. Byers explained that J.J. told him that she was feeling unwell, so he applied it to her feet to help her sleep and instructed J.J. to rub the ointment on her chest. Later, however, Byers agreed that J.J. was not having trouble sleeping and that he applied ointment to her feet even though she was already asleep because he "thought at the time that it needed to be done."

*The trial court's decision*

**{¶22}** The trial court found Byers guilty of gross sexual imposition. It recognized that the case "comes down to . . . the victim's testimony versus the defendant's." It found that Byers's "reason for waking her up doesn't make a lot of sense." The trial court pointed out that J.J. was already asleep and Byers's explanation that he woke her up to put ointment on her feet was "[k]ind of hard to believe."

**{¶23}** The trial court recognized that J.J. was not questioned about ointment, so Byers's testimony was not necessarily inconsistent with J.J.'s testimony. But it found that Byers lacked credibility: it found Byers's explanation "a little weird" and "kind of incredible that [Byers] use[s] ointment all over [his] body for everything, and it's unusual and hard to believe that you'd wake a child up, 11 year old, who is sleeping on your couch because they had said they weren't feeling well, their stomach and their head, which is what she said, to put ointment on her feet." The court also found it "a little bit hard to believe" that Byers did not remember the text messages with Mother. In contrast, it found J.J. "pretty consistent," despite the inconsistencies about calling her mother. But based on J.J.'s "demeanor and talking and speaking about what happened that night and why," the trial court found J.J. credible.

**{¶24}** The trial court sentenced Byers to three years in prison and classified him as a Tier I sex offender.

## II.    Analysis

**{¶25}** Byers challenges the evidence of his mental culpability supporting his conviction in two assignments of error. First, he argues that there was insufficient evidence to prove that he touched J.J. for the purpose of sexual arousal or gratification. Second, he argues that his conviction is against the manifest weight of the evidence

because the weight of the evidence proves that he did not touch J.J. for the purpose of sexual arousal or gratification.

{¶26} Under R.C. 2907.05(A)(4), "[n]o person shall have sexual contact with another, not the spouse of the offender . . . when . . . [t]he other person . . . is less than thirteen years of age." Sexual contact is "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶27} An act is done with purpose if it is the person's "specific intention to cause a certain result." R.C. 2901.22(A). So, to demonstrate sexual contact under R.C. 2907.01(B), evidence must prove that "the touching [was] intended to achieve sexual arousal or gratification." *State v. Dunlap*, 2011-Ohio-4111, ¶ 25. Determining whether an erogenous zone was touched "for the purpose of sexual gratification or arousal is 'a question of fact to be inferred from the type, nature, and circumstances surrounding the contact.'" *State v. Hodgkin*, 2019-Ohio-1686, ¶ 10 (1st Dist.), quoting *State v. Mack*, 2006-Ohio-6284, ¶ 9 (1st Dist.). Moreover, "'the act of touching may constitute strong evidence of intent.'" *Id.* at ¶ 10, quoting *Mack* at ¶ 9. But "touching an erogenous zone[, by itself,] is insufficient to establish that the contact was for the purpose of sexual arousal or gratification." *State v. Alanani*, 2024-Ohio-5660, ¶ 17 (1st Dist.).

A. *The victim's testimony was sufficient to convict Byers*

{¶28} Byers's first assignment of error maintains that the evidence was insufficient to prove that he touched J.J. to achieve sexual gratification or arousal. He claims the evidence proves that he made contact with J.J. to give her medical care.

{¶29} To determine whether sufficient evidence established Byers's purpose, we "must review the evidence in the light most favorable to the prosecution and

determine whether any rational trier of fact could have found that all the elements of the crimes had been proven beyond a reasonable doubt." *Hodgkin* at ¶ 3, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶30}** Here, the type and nature of the contact described by J.J. create an inference that Byers rubbed her breasts for the purpose of sexual arousal or gratification. J.J. testified that she woke up in the middle of the night to Byers licking her toes. He then moved his hands under her shirt and touched her breasts.

**{¶31}** Byers appears to suggest that there must be direct evidence of sexual arousal or gratification. But "'there is no requirement that there be direct testimony regarding sexual arousal or gratification.'" *State v. Brown*, 2014-Ohio-4158, ¶ 19 (7th Dist.), quoting *In re D.S.,* 2005-Ohio-1803, ¶ 19. Indeed, a victim's "testimony, if believed, is sufficient evidence" to prove sexual contact. *State v. White*, 2017-Ohio-1488, ¶ 46 (3d Dist.).

**{¶32}** Byers relies on his testimony and statements to law enforcement as evidence that his actions did not reflect a purpose to achieve sexual arousal or gratification. He argues that he credibly established that he applied ointment to J.J.'s feet and then instructed her to apply ointment to her chest. In essence, he asks us to accept his testimony to hold that the State's evidence is insufficient to establish his purpose. But evaluating witness credibility "is not proper on review for evidentiary sufficiency." *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79.

**{¶33}** In sum, we hold that, when viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that Byers touched J.J.'s erogenous zone with purpose to achieve sexual arousal or gratification. We overrule Byers's first assignment of error.

B. *Byers's conviction is not against the manifest weight of the evidence*

**{¶34}** In his second assignment of error, Byers argues that the evidence overwhelmingly proves his innocence. He emphasizes his account and the lack of corroborating evidence. Following a review of the record, we disagree.

**{¶35}** In contrast to a sufficiency challenge, "[a] manifest weight challenge scrutinizes the proclivity of the greater amount of credible evidence, offered at a trial, to support one side of the issue over another." *State v. Schmidt*, 2022-Ohio-4138, ¶ 62 (12th Dist.). To hold that a conviction is against the manifest weight of the evidence, this court must "weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed." *Hodgkin*, 2019-Ohio-1686, at ¶ 3 (1st Dist.). While we do consider the credibility of the witnesses as part of our review, we "typically defer[] to a trial court's credibility findings unless it 'clearly lost its way.'" *State v. Jackson*, 2024-Ohio-2728, ¶ 16 (1st Dist.), quoting *State v. Blount*, 2019-Ohio-3498, ¶ 9 (1st Dist.). Indeed, "'the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented.'" *Id.*, quoting *State v. Bullock*, 2022-Ohio-925, ¶ 14 (1st Dist.), quoting *State v. Carson*, 2019-Ohio-4550, ¶ 16 (1st Dist.).

**{¶36}** First, Byers relies on Helton's inability to confirm whether sexual contact occurred. But it is well established that "'"[a]n expert may not offer an opinion as to the truth of the child's statements."'" *State v. Mincey*, 2023-Ohio-472, ¶ 46 (1st Dist.), quoting *State v. Svoboda*, 2021-Ohio-4197, ¶ 93 (1st Dist.), quoting *State v. Stowers*, 81 Ohio St.3d 260, 263 (1998).

**{¶37}** Second, Byers's attempt to challenge J.J.'s credibility is unconvincing. Convictions "'"may rest solely on the testimony of a single witness, including the

victim, if believed, and there is no requirement that a victim's testimony be corroborated to be believed."'" *State v. Wright*, 2024-Ohio-851, ¶ 32 (1st Dist.), quoting *State v. Mitchell*, 2022-Ohio-3713, ¶ 17 (1st Dist.), quoting *State v. Robertson*, 2018-Ohio-2934, ¶ 38 (8th Dist.). Appellate courts defer to the trial court on the issue of credibility of "child victims of sexual abuse," where the trial court can "observe and determine the maturity, sincerity, and believability of a child victim's testimony." *State v. Wells*, 2006-Ohio-874, ¶ 21 (12th Dist.). Inconsistencies in a child's testimony "alone do not render a conviction against the manifest weight or sufficiency of the evidence." *State v. Wolters*, 2022-Ohio-538, ¶ 20 (5th Dist.). Indeed, the trier of fact is "'free to use [its] life experiences in assessing the testimony of a child vers[u]s an adult and draw its conclusion.'" *Wright* at ¶ 36, quoting *State v. Allen*, 2022-Ohio-268, ¶ 31 (5th Dist.).

**{¶38}** Significantly, Byers has not addressed the trial court's conclusion that parts of his testimony—his rubbing a menthol-based ointment all over his body for every ailment, waking up J.J. to rub ointment on her to help her sleep, not remembering that a detective contacted him multiple times, and not remembering text messages from Mother telling him that J.J. accused him of inappropriately touching her—was "hard to believe" and do not "make sense." The trial court was not required to accept Byers's account as credible. His conviction is not against the manifest weight of the evidence simply because the trial court found J.J.'s account credible, and Byers's account incredible. We overrule the second assignment of error.

### III.   Conclusion

**{¶39}** We overrule the assignments of error and affirm the conviction.

Judgment affirmed.

**KINSLEY, P.J.,** and **ZAYAS, J.,** concur.

12